ORAL ARGUMENT NOT YET SCHEDULED

**No. 19-1230**

Consolidated with Nos. 19-1239, 19-1241, 19-1242, 19-1243, 19-1245, 19-1246, 19-1249, 20-1175, and 20-1178

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

UNION OF CONCERNED SCIENTISTS et al.,
*Petitioners*,

v.

NATIONAL HIGHWAY TRAFFIC SAFETY ADMINISTRATION,
*Respondent,*

COALITION FOR SUSTAINABLE AUTOMOTIVE REGULATION et al.,
*Respondent-Intervenors*.

# PROOF BRIEF OF STATE AND LOCAL GOVERNMENT PETITIONERS AND PUBLIC INTEREST PETITIONERS

XAVIER BECERRA
Attorney General of California
ROBERT W. BYRNE
EDWARD H. OCHOA
Senior Assistant Attorneys General
GARY E. TAVETIAN
DAVID A. ZONANA
Supervising Deputy Attorneys General

JESSICA BARCLAY-STROBEL
JULIA K. FORGIE
MEREDITH HANKINS
KAVITA LESSER
CAROLYN NELSON ROWAN
TIMOTHY E. SULLIVAN
JONATHAN WIENER
M. ELAINE MECKENSTOCK
Deputy Attorneys General
1515 Clay Street, 20th Floor
Oakland, CA 94612-0550
Telephone: (510) 879-0299
Elaine.Meckenstock@doj.ca.gov

*Attorneys for Petitioner State of California, by and through its Governor Gavin Newsom, Attorney General Xavier Becerra, and the California Air Resources Board*

*Additional counsel listed in signature block*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), the undersigned counsel provides the following information for all consolidated cases.

### A. Parties and *Amici*

Petitioners:

In case number 19-1230, petitioners are Union of Concerned Scientists, Center for Biological Diversity, Conservation Law Foundation, Environment America, Environmental Defense Fund, Environmental Law & Policy Center, Natural Resources Defense Council, Inc., Public Citizen, Inc., and Sierra Club.

In case number 19-1239, petitioners are the States of California (by and through Governor Gavin Newsom, Attorney General Xavier Becerra, and the California Air Resources Board), Colorado, Connecticut, Delaware, Hawaii, Illinois, Maine, Maryland, Minnesota, Nevada, New Jersey, New Mexico, New York, North Carolina, Oregon, Rhode Island, Vermont, Washington, and Wisconsin; the Commonwealths of Massachusetts, Pennsylvania, and Virginia; the People of the State of Michigan; the District of Columbia; and the Cities of Los Angeles and New York.

In case number 19-1241, petitioners are the South Coast Air Quality Management District, Bay Area Air Quality Management District, and Sacramento Metropolitan Air Quality Management District.

In case number 19-1242, petitioner is the National Coalition for Advanced Transportation.

In case number 19-1243, petitioners are Sierra Club, Center for Biological Diversity, Chesapeake Bay Foundation, Inc., Communities for a Better Environment, Conservation Law Foundation, Environment America, Environmental Defense Fund, Environmental Law & Policy Center, Natural Resources Defense Council, Inc., Public Citizen, Inc., and Union of Concerned Scientists.

In case number 19-1245, petitioners are Calpine Corporation, Consolidated Edison, Inc., National Grid USA, New York Power Authority, and Power Companies Climate Coalition.

In case number 19-1246, petitioner is the City and County of San Francisco.

In case number 19-1249, petitioner is Advanced Energy Economy.

In case number 20-1175, petitioners are Advanced Energy Economy, Calpine Corporation, Consolidated Edison, Inc., National Coalition for Advanced Transportation, National Grid USA, New York Power Authority, and Power Companies Climate Coalition.

In case number 20-1178, petitioners are Union of Concerned Scientists, Center for Biological Diversity, Chesapeake Bay Foundation, Inc., Communities for a Better Environment, Conservation Law Foundation, Environment

America, Environmental Defense Fund, Environmental Law & Policy Center, Natural Resources Defense Council, Inc., Public Citizen, Inc., and Sierra Club.[1]

Petitioners in Cases No. 19-1230, 19-1241, and 20-1178 state as follows in accordance with Circuit Rule 26.1:

1. Center for Biological Diversity is a nonstock corporation that does not issue shares or debt securities, and it has no parent companies. Center for Biological Diversity is a national, nonprofit conservation organization incorporated under the laws of the State of Arizona and headquartered in Tucson, that is dedicated to the protection of endangered species and the environment.

2. Chesapeake Bay Foundation, Inc., is a nonstock corporation that does not issue shares or debt securities, and it has no parent companies. Chesapeake Bay Foundation is a nonprofit, nonpartisan organization whose mission is to "Save the Bay" and keep it saved, as defined by reaching a 70 on the Chesapeake Bay Foundation's Health Index. Chesapeake Bay Foundation is incorporated under the laws of Maryland with offices in Maryland, Pennsylvania, Virginia, and the District of Columbia.

---

[1] Although the parties' joint briefing proposal suggested petitioners would file up to four separate briefs, ECF No. 1832077, after the Court reduced the number of cumulative words available for petitioners' briefs, ECF No. 1843712, a majority of petitioners agreed to file a common brief presenting issues on which their positions are aligned in order to maximize the number of meritorious issues presented.

3. Communities for a Better Environment is a nonstock corporation that does not issue shares or debt securities, and it has no parent companies. Communities for a Better Environment is a nonprofit corporation with a mission of achieving environmental health and justice. Communities for a Better Environment works to secure clean air and reduce pollutant emissions in its members' communities, and to address climate change emissions and impacts locally, regionally, and beyond.

4. Conservation Law Foundation is a nonstock corporation that does not issue shares or debt securities, and it has no parent companies. Conservation Law Foundation is a nonprofit, member-supported environmental organization whose vision is a healthy, thriving New England—for generations to come. It uses the law, science, and the market to create solutions that preserve our natural resources, build healthy communities, and sustain a vibrant economy. Conservation Law Foundation is incorporated in the Commonwealth of Massachusetts with offices in Massachusetts, Maine, New Hampshire, Vermont, and Rhode Island.

5. Environment America is a nonstock corporation that does not issue shares or debt securities, and it has no parent companies. Environment America works for clean air, clean water, clean energy, wildlife and open spaces, and a livable climate. Environment America is incorporated under the laws of the State of Colorado, with headquarters in Denver, Colorado.

6. Environmental Defense Fund is a nonstock corporation that does not issue shares or debt securities, and it has no parent companies. Environmental Defense Fund is a national non-profit organization that links science, economics, and law to create innovative, equitable, and cost-effective solutions to urgent environmental problems. Environmental Defense Fund is organized under the laws of the State of New York with its headquarters in New York City.

7. Environmental Law & Policy Center is a nonstock corporation that does not issue shares or debt securities, and it has no parent companies. Environmental Law & Policy Center is a nongovernmental corporation that works to improve public health and to protect our natural resources across the Great Lakes States and the Midwest region. Environmental Law & Policy Center is incorporated under the laws of the State of Illinois with offices in Illinois, Iowa, Michigan, Minnesota, Ohio, Wisconsin, and Washington, D.C.

8. Natural Resources Defense Council, Inc., is a nonstock corporation that does not issue shares or debt securities, and it has no parent companies. Natural Resources Defense Council is a nongovernmental corporation that engages in research, advocacy, public education, and litigation to protect public health and the environment. Natural Resources Defense Council is a tax-exempt organization incorporated under the laws of the State of New York, with headquarters in New York City.

9. Public Citizen, Inc., is a nonstock corporation that does not issue shares or debt securities, and it has no parent companies. Public Citizen is a nongovernmental corporation that engages in research, advocacy, media activity, and litigation related to advancing health and safety, consumer protection, and the environment, among other things. Public Citizen is incorporated in the District of Columbia and has its principal offices in Washington, D.C.

10. Sierra Club is a nonstock corporation that does not issue shares or debt securities, and it has no parent companies. Sierra Club is a nongovernmental corporation whose mission is to explore, enjoy, and protect the wild places of the Earth; to practice and promote the responsible use of the Earth's resources and ecosystems; to educate and enlist humanity to protect and restore the quality of the natural and human environment; and to use all lawful means to carry out these objectives. Sierra Club is incorporated under the laws of the State of California, with its principal place of business in Oakland, California.

11. Union of Concerned Scientists is a nonstock corporation that does not issue shares or debt securities, and it has no parent companies. Union of Concerned Scientists is a nongovernmental corporation that puts rigorous, independent science to work to solve our planet's most pressing problems by combining technical analysis and effective advocacy to create innovative, practical solutions for a healthy, safe, and sustainable future. Union of

Concerned Scientists is incorporated under the laws of Washington, D.C., with headquarters in the State of Massachusetts.

Respondents:

In these consolidated cases, Respondents are the National Highway Traffic Safety Administration; James C. Owens, in his official capacity as Acting Administrator, National Highway Traffic Safety Administration; the United States Department of Transportation; Elaine L. Chao, in her official capacity as Secretary, United States Department of Transportation; the United States Environmental Protection Agency; and Andrew R. Wheeler, in his official capacity as Administrator, United States Environmental Protection Agency.

Intervenors:

Respondent-Intervenors are the American Fuel & Petrochemical Manufacturers, Automotive Regulatory Council, Inc., Coalition for Sustainable Automotive Regulation, and the States of Alabama, Alaska, Arkansas, Georgia, Indiana, Louisiana, Missouri, Nebraska, Ohio, South Carolina, Texas, Utah, and West Virginia.

*Amici Curiae*:

No individuals or entities have yet filed notices of intent to appear as *amicus curiae*. On May 26, 2020, all parties in these consolidated cases[2] consented to the filing of amicus briefs provided *amici* comply with Federal Rule of Appellate Procedure 29, Circuit Rule 29, and applicable orders of the Court. ECF No. 1844268.

### B. Rulings Under Review

These consolidated petitions challenge actions of the U.S. Environmental Protection Agency and the National Highway Traffic Safety Administration jointly published as "The Safer Affordable Fuel-Efficient (SAFE) Vehicles Rule Part One: One National Program," 84 Fed. Reg. 51,310 (Sept. 27, 2019).

### C. Related Cases

The U.S. District Court for the District of Columbia has consolidated and stayed three cases in which petitioners here have challenged the same action of the National Highway Traffic Safety Administration that is at issue here. *California v. Chao*, No. 19-cv-2826-KBJ (filed Sept. 20, 2019).

/s/ M. Elaine Meckenstock
M. ELAINE MECKENSTOCK

[2] Although petitioners in case numbers 20-1175 and 20-1178 did not expressly join the consent notice in their capacity as petitioners in those cases, they are the same petitioners as in case numbers 19-1242, 19-1243, 19-1245, and 19-1249.

## TABLE OF CONTENTS

**Page**


CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ..... i

INTRODUCTION ..... 1

JURISDICTIONAL STATEMENT ..... 3

ISSUES PRESENTED ..... 3

STATUTES AND REGULATIONS ..... 5

STATEMENT OF THE CASE ..... 5

A. State and Federal Regulation of Motor Vehicle Emissions ..... 5

B. Federal Regulation of Vehicle Fuel Economy ..... 14

C. A Harmonized National Program ..... 19

D. The Challenged Actions ..... 20

STANDARD OF REVIEW ..... 22

SUMMARY OF ARGUMENT ..... 22

STANDING ..... 26

ARGUMENT ..... 27

I. EPA's Waiver Withdrawal Is Unlawful ..... 27

A. EPA Lacks Authority for Its Waiver Withdrawal ..... 28

B. EPA's Section 209(b)(1)(B) Determination Is Unlawful ..... 39

C. EPA's Reliance on NHTSA's Preemption Rule Is Unlawful ..... 65

II. EPA's Section 177 Determination Is Unlawful ..... 68

A. EPA's Section 177 Determination Exceeds Its Authority ..... 69

B. EPA's Interpretation Is Contrary to the Relevant Statutory Provisions ..... 70

**TABLE OF CONTENTS**
**(continued)**

**Page**

III. This Court Should Vacate NHTSA's Preemption Rule If It Has Jurisdiction to Directly Review It ..... 73

A. NHTSA's Preemption Rule Must Be Reviewed First by the District Court Because This Court Lacks Jurisdiction ..... 74

B. NHTSA Lacks Authority to Pronounce Upon Preemption ..... 78

C. NHTSA Errs in Construing EPCA to Expressly Preempt Greenhouse Gas and Zero-Emission-Vehicle Standards for Which EPA Has Granted a Section 209(b) Waiver ..... 82

D. NHTSA Errs in Interpreting EPCA to Impliedly Preempt Greenhouse Gas and Zero-Emission-Vehicle Standards ..... 107

E. NHTSA Violated the National Environmental Policy Act ..... 108

CONCLUSION ..... 110

## TABLE OF AUTHORITIES

**Page**

**CASES**


*Alaska Dep't of Envtl. Conservation v. EPA*,
540 U.S. 461 (2004) ....................22

*Alaska v. DOT*,
868 F.2d 441 (D.C. Cir. 1989) ....................26

*Am. Bird Conservancy, Inc. v. FCC,*
516 F.3d 1027 (D.C. Cir. 2008) ....................109

*Am. Methyl Corp. v. EPA*,
749 F.2d 826 (D.C. Cir. 1984) .................... 32, 34, 35, 39

**Am. Trucking Ass'ns, Inc. v. EPA*,
600 F.3d 624 (D.C. Cir. 2010) .................... 45, 46

*Am. Wild Horse Pres. Campaign v. Perdue*,
873 F.3d 914 (D.C. Cir. 2017) ....................57

*Bostock v. Clayton Cty.*,
-- S. Ct. --, 2020 WL 3146686 (June 15, 2020) ....................49, 51, 106

*Butte Cty. v. Hogen*,
613 F.3d 190 (D.C. Cir. 2010) ....................64

*Cal. Div. of Labor Stds. Enforcement v. Dillingham Constr.*,
519 U.S. 316 (1997) ....................106

*California v. Chao*,
D.D.C. Case No. 1:19-cv-02826-KBJ (filed Sept. 20, 2019).................... 74, 76

*California v. Watt*,
668 F.2d 1290 (D.C. Cir. 1981) ....................15


*Authorities upon which Petitioners chiefly rely are marked with asterisks.

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

*California v. Wheeler*,
D.C. Cir. No. 20-1167 (filed May 27, 2020) ....................................................22

*Capron v. Office of Atty. Gen.*,
944 F.3d 9 (1st Cir. 2019) ..........................................................................83

*Carter v. United States*,
530 U.S. 255 (2000) ..................................................................................72

*Cent. United Life Ins. Co. v. Burwell*,
827 F.3d 70 (D.C. Cir. 2016)......................................................................78

*Cent. Valley Chrysler-Jeep, Inc. v. Goldstene*,
529 F. Supp. 2d 1151 (E.D. Cal. 2007) (as corrected Mar. 26, 2008)....... 18, 95

*Chamber of Commerce v. Whiting*,
563 U.S. 582 (2011) ................................................................................107

*Chapman v. El Paso Nat. Gas Co.,*
204 F.2d 46 (D.C. Cir. 1953)......................................................................36

*Clark v. Martinez*,
543 U.S. 371 (2005) ..................................................................................41

*Comm. for a Better Arvin v. EPA*,
786 F.3d 1169 (9th Cir. 2015) ....................................................................31

*Common Cause v. Dep't of Energy*,
702 F.2d 245 (D.C. Cir. 1983) ...................................................................15

*Coventry Health Care of Mo. v. Nevils*,
137 S. Ct. 1190 (2017) ...............................................................................85

*CSX Transp., Inc. v. STB*,
584 F.3d 1076 (D.C. Cir. 2009) .................................................................38

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

*CTS Corp. v. Waldburger*,
573 U.S. 1 (2014) ........................................................................................29

*Cty. of Delaware v. Dep't of Transp.*,
554 F.3d 143 (D.C. Cir. 2009) ...........................................................................64

*Delaware v. STB*,
859 F.3d 16 (D.C. Cir. 2017)...........................................................................83

*Delta Air Lines, Inc. v. C.A.B.*,
561 F.2d 293 (D.C. Cir. 1977) ...........................................................................64

*Delta Constr. Co. v. EPA*,
783 F.3d 1291 (D.C. Cir. 2015) .........................................................................78

*DHS. v. Regents of the Univ. of Cal.*,
-- S. Ct. --, 2020 WL 3271746 (June 18, 2020) .........................35, 37, 46, 68, 73

*Encino Motorcars, LLC v. Navarro*,
136 S. Ct. 2117 (2016) ............................................................................ 67, 73

**Engine Mfrs. Ass'n v. EPA*,
88 F.3d 1075 (D.C. Cir. 1996) .............................................................................6

*Epic Sys. Corp. v. Lewis*,
138 S. Ct. 1612 (2018) ......................................................................................83

*Ethyl Corp. v. EPA*,
51 F.3d 1053 (D.C. Cir. 1995) ...........................................................................66

*FCC v. Fox Television Stations, Inc.* (*Fox*),
556 U.S. 502 (2009) .........................................................................37, 46, 68

*Fin. Planning Ass'n v. SEC*,
482 F.3d 481 (D.C. Cir. 2007) ...........................................................................91

## TABLE OF AUTHORITIES
## (continued)

**Page**


*Ford Motor Co. v. EPA*,
606 F.2d 1293 (D.C. Cir. 1979) .................................................................. 29, 69

*Franks Inv. Co. v. Union Pac. R.R. Co.*,
593 F.3d 404 (5th Cir. 2010)........................................................................83

*Genuine Parts Co. v. EPA*,
890 F.3d 304 (D.C. Cir. 2018) ..................................................................... 58, 64

*Gobeille v. Liberty Mut. Ins. Co.*,
136 S. Ct. 936 (2016) .................................................................................. 86, 89

*Gonzales v. Oregon*,
546 U.S. 243 (2006) .................................................................................... 69, 79

*Green Mountain Chrysler Plymouth Dodge Jeep v. Crombie*,
508 F. Supp. 2d 295 (D. Vt. 2007) ................................................ 18, 88, 95, 101

*Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives*,
920 F.3d 1 (D.C. Cir. 2019)..........................................................................81

*HTH Corp. v. NLRB*,
823 F.3d 668 (D.C. Cir. 2016) ......................................................................28

*Humane Soc. of U.S. v. Johanns*,
520 F. Supp. 2d 8 (D.D.C. 2007) .................................................................109

*Int'l Union v. Marshall*,
584 F.2d 390 (D.C. Cir. 1978).......................................................................15

*Int'l Union v. NLRB*,
675 F.2d 1257 (D.C. Cir. 1982) ...................................................................106

*Jackson v. Modly*,
949 F.3d 763 (D.C. Cir. 2020) ......................................................................43

**TABLE OF AUTHORITIES**
**(continued)**

**Page**


*Kansas v. Garcia*,
140 S. Ct. 791 (2020) ........................................................................81

*La. Pub. Serv. Comm'n v. FCC*,
476 U.S. 355 (1986) ........................................................................29

*Life Techs. Corp. v. Promega Corp.*,
137 S. Ct. 734 (2017) ........................................................................42

*Lusnak v. Bank of Am., N.A.*,
883 F.3d 1185 (9th Cir. 2018) ........................................................................83

*Maracich v. Spears*,
570 U.S. 48 (2013) ........................................................................86

**Massachusetts v. EPA*,
549 U.S. 497 (2007) ........................................................ 14, 18, 49, 54, 58, 94

*Mazaleski v. Treusdell*,
562 F.2d 701 (D.C. Cir. 1977) ........................................................................37

*Medtronic, Inc. v. Lohr*,
518 U.S. 470 (1996) ........................................................................79

*Mellouli v. Lynch*,
135 S. Ct. 1980 (2015) ........................................................................85

**Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*,
456 U.S. 353 (1982) ........................................................................44, 96

*Michigan v. EPA*,
268 F.3d 1075 (D.C. Cir. 2001) ........................................................................28, 34

**Motor & Equip. Mfrs. Ass'n, Inc. v. EPA* (*MEMA I*),
627 F.2d 1095 (D.C. Cir. 1979) ..................5, 6, 9, 10, 11, 34, 35, 42, 46, 50, 66

**TABLE OF AUTHORITIES**
**(continued)**

**Page**


**Motor & Equip. Mfrs. Ass'n v. Nichols* (*MEMA II*),
142 F.3d 449 (D.C. Cir. 1998) ....................................................11, 54, 66

*Motor Vehicle Mfrs. Ass'n v. NYSDEC*,
79 F.3d 1298 (2d Cir. 1996) ....................................................................30

*Motor Vehicle Mfrs. Ass'n v. NYSDEC*,
17 F.3d 521 (2d Cir. 1994)..................................................................... 69, 70

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) ..................................................................................71, 104

*Mozilla Corp. v. FCC*,
940 F.3d 1 (D.C. Cir. 2019)........................................................80, 81, 82, 88, 107

*N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*,
514 U.S. 645 (1995) .............................................................85, 96, 106, 107

*Nat'l Ass'n of Home Builders v. Defenders of Wildlife*,
551 U.S. 644 (2007) ...................................................................................71

*Nat'l Auto. Dealers Ass'n v. FTC*,
670 F.3d 268 (D.C. Cir. 2012) ....................................................................74

*Nat'l Ctr. for Mfg. Sci. v. Dep't of Def.*,
199 F.3d 507 (D.C. Cir. 2000) ....................................................................72

**Nat'l Ass'n of Mfrs. v. Dep't of Defense* (*NAM*),
138 S. Ct. 617 (2018) .............................................................................. 75, 77

*Nw. Austin Mun. Util. Dist. No. One v. Holder*,
557 U.S. 193 (2009) ...................................................................................52

*PDK Labs. Inc. v. DEA*,
362 F.3d 786 (D.C. Cir. 2004) .............................................................. 83, 84

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

*Pub. Citizen, Inc. v. NHTSA*,
489 F.3d 1279 (D.C. Cir. 2007) .......... 74, 75

*Rotkiske v. Klemm*,
140 S. Ct. 355 (2019) .......... 80

*SEC v. Gemstar-TV Guide Int'l, Inc.*,
401 F.3d 1031 (9th Cir. 2005) .......... 55

*Seminole Tribe v. Stranburg*,
799 F.3d 1324 (11th Cir. 2015) .......... 83

*Shelby Cty. v. Holder*,
570 U.S. 529 (2013) .......... 52

*Sickle v. Torres Adv. Enter. Solutions, LLC*,
884 F.3d 338 (D.C. Cir. 2018) .......... 107

*Sikkelee v. Precision Airmotive Corp.*,
822 F.3d 680 (3d Cir. 2016) .......... 83

*Smiley v. Citibank (South Dakota)*,
517 U.S. 735 (1996) .......... 81

*Steel Inst. v. City of New York*,
716 F.3d 31 (2d Cir. 2013) .......... 83

*Tidewater Oil Co. v. United States*,
409 U.S. 151 (1972) .......... 78

*TRW Inc. v. Andrews*,
534 U.S. 19 (2001) .......... 49

*United States v. Hubbell*,
167 F.3d 552 (D.C. Cir. 1999) .......... 86

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

*United States v. Santos*,
553 U.S. 507 (2008) ....................................................................................41

*United States v. Seatrain Lines Inc.*,
329 U.S. 424 (1947) ....................................................................................36

*Utility Air Regulatory Group v. EPA* (*UARG*),
573 U.S. 302 (2014) ......................................................................41, 45, 70

*Whitman v. Am. Trucking Ass'ns*,
531 U.S. 457 (2001) ........................................................................8, 33, 72

*Wisc. Cent. Ltd. v. United States*,
138 S. Ct. 2067 (2018) ..........................................................................88, 106

*Wyeth v. Levine*,
555 U.S. 555 (2009) ...................................................................78, 80, 81, 82

**CONSTITUTIONAL PROVISIONS**

U.S. Const. art. VI, cl. 2..................................................................................81

**FEDERAL STATUTES AND PUBLIC LAWS**

Current statutes:

5 U.S.C. § 706(2)(A) ......................................................................................22

5 U.S.C. § 706(2)(C) ......................................................................................22

5 U.S.C. § 706(2)(D)......................................................................................108

## TABLE OF AUTHORITIES
## (continued)

**Page**

33 U.S.C. § 1369(b)(1)(E) .......... 77

42 U.S.C. § 4332(2)(C) .......... 108

42 U.S.C. § 6201(5) .......... 15

42 U.S.C. § 6297(d) .......... 80

42 U.S.C. § 7401 .......... 32

42 U.S.C. § 7402(a) .......... 48

42 U.S.C. § 7410(a)(2)(D) .......... 31

42 U.S.C. § 7410(c)(1) .......... 31

42 U.S.C. § 7412(b)(1) .......... 48

42 U.S.C. § 7415 .......... 49

42 U.S.C. § 7416 .......... 29

42 U.S.C. § 7426 .......... 49

42 U.S.C. § 7502 .......... 71, 72

42 U.S.C. § 7502(c)(1) .......... 31

42 U.S.C. § 7505a .......... 71

42 U.S.C. § 7506(c)(1) .......... 32

*42 U.S.C. § 7507 .......... 4, 10, 24, 51, 68, 69, 70, 71, 105

42 U.S.C. § 7509 .......... 31

42 U.S.C. § 7511c .......... 71

## TABLE OF AUTHORITIES
## (continued)

**Page**

42 U.S.C. § 7521(a) .......... 10

42 U.S.C. § 7543(a) .......... 42, 50, 70, 89

42 U.S.C. § 7543(b) .......... 50

*42 U.S.C. § 7543(b)(1) .......... 3, 10, 23, 28, 39, 42, 70

*42 U.S.C. § 7543(b)(1)(B) .......... 3, 23, 39

42 U.S.C. § 7543(b)(1)(C) .......... 44

42 U.S.C. § 7543(b)(2) .......... 42

42 U.S.C. § 7543(b)(3) .......... 106

42 U.S.C. § 7543(e)(2) .......... 10, 72

42 U.S.C. § 7543(e)(2)(A) .......... 44

42 U.S.C. § 7543(e)(2)(A)(ii) .......... 44

42 U.S.C. § 7543(e)(2)(A)(iii) .......... 44

42 U.S.C. § 7545(c)(4)(A) .......... 33

42 U.S.C. § 7545(c)(4)(B) .......... 33

42 U.S.C. § 7545(c)(4)(C)(i) .......... 33

42 U.S.C. § 7586(f)(4) .......... 50, 94

*42 U.S.C. § 7601 .......... 69

42 U.S.C. § 7607(b)(1) .......... 3, 75

42 U.S.C. § 13212(f) .......... 96

## TABLE OF AUTHORITIES
## (continued)

**Page**


42 U.S.C. § 13212(f)(2)(A) .......... 96

42 U.S.C. § 13212(f)(3) .......... 50

42 U.S.C. § 17002 .......... 19, 95

49 U.S.C. § 322(a) .......... 75, 79

49 U.S.C. § 5125(d) .......... 80

49 U.S.C. § 5125 .......... 79

49 U.S.C. § 31141 .......... 79

49 U.S.C. § 32901(a)(1) .......... 76, 104

49 U.S.C. § 32901(a)(6) .......... 15, 105

49 U.S.C. § 32901(a)(8) .......... 104

49 U.S.C. § 32901(a)(10) .......... 76

49 U.S.C. § 32901(a)(11) .......... 102

49 U.S.C. § 32901(a)(14) .......... 76

49 U.S.C. § 32901(a)(15) .......... 76

49 U.S.C. § 32901(a)(17) .......... 87

49 U.S.C. § 32901(a)(18) .......... 76

49 U.S.C. § 32901(b) .......... 76

49 U.S.C. § 32901(c) .......... 76

49 U.S.C. § 32902 .......... 76

**Page**

49 U.S.C. § 32902(b)(2)....18

*49 U.S.C. § 32902(f)....16, 18, 90

*49 U.S.C. § 32902(h)....17, 104

49 U.S.C. § 32902(i)....76

49 U.S.C. § 32903....105

49 U.S.C. § 32903(f)....76, 77

49 U.S.C. § 32903(g)....76

49 U.S.C. § 32904(a)....103

49 U.S.C. § 32904(a)(2)....17

49 U.S.C. § 32904(a)(2)(B)....102

49 U.S.C. § 32904(c)....99

49 U.S.C. § 32905(c)....102

49 U.S.C. § 32907(b)....77

*49 U.S.C. § 32909(a)....75

49 U.S.C. § 32909(a)(1)....76

49 U.S.C. § 32919....75

*49 U.S.C. § 32919(a)....16, 25, 79, 85, 103

49 U.S.C. § 32919(c)....97

## TABLE OF AUTHORITIES
## (continued)

**Page**

Historical statutes:


15 U.S.C. §§ 2001-2012 (1976) ....................15

15 U.S.C. § 2001(1) (1976) ....................16, 103

15 U.S.C. § 2001(3) (1976) ....................87

15 U.S.C. § 2001(5) (1976) ....................16

15 U.S.C. § 2001(7) (1976) ....................15

15 U.S.C. § 2002(a)(1) (1976)....................15, 87, 92

15 U.S.C. § 2002(a)(4) (1976)....................17

15 U.S.C. § 2002(b) (1976) ....................92

15 U.S.C. § 2002(c) (1976)....................92

15 U.S.C. § 2002(d) (1976)....................88

15 U.S.C. § 2002(d)(3) (1976) ....................89

15 U.S.C. § 2002(d)(3)(C)(i) (1976) ....................90

15 U.S.C. § 2002(d)(3)(C)(i) (1976) ....................88

15 U.S.C. § 2002(d)(3)(D) (1976) ....................89

*15 U.S.C. § 2002(d)(3)(D)(i) (1976) .................... 16, 88

*15 U.S.C. § 2002(e) (1976)....................16, 90, 92

15 U.S.C. § 2004(a) (1976)....................77

15 U.S.C. § 2009(a) (1976).................... 16, 89

Page

Pub. L. No. 89-272, 79 Stat. 992 (1965) ........ 5

Pub. L. No. 90-148, 81 Stat. 485 (1967) ........ 5, 6, 8

Pub. L. No. 91-604, 84 Stat. 1676 (1970) ........ 6, 8

Pub. L. No. 94-163, 89 Stat. 871 (1975) (EPCA) ........ 15, 80

Pub. L. No. 95-95, 91 Stat. 685 (1977) ........ 9

Pub. L. No. 96-185, 93 Stat. 1324 (1980) ........ 17

Pub. L. No. 102-486, 106 Stat. 2776 (1992) ........ 17, 103

Pub. L. No. 103-272 (Title 49 Consolidation), 108 Stat. 745 (1994) ........ 78, 90

Pub. L. No. 110-140, 121 Stat. 1492 (2007) (EISA) ........ 14, 96

**STATE STATUTES**

1959 Cal. Stat. 2091 ........ 5

1968 Cal. Stat. 1463 ........ 11

2002 Cal. Stat. c. 200 (A.B. 1493) ........ 13

Cal. Civ. Proc. Code § 1085 ........ 34

Cal. Gov't Code § 11340.6 ........ 34

Cal. Health & Safety Code § 43018.5(a) ........ 13

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

## REGULATIONS

Federal regulations:


40 C.F.R. § 88.104-94(g) ......................................................................94

40 C.F.R. § 88.104-94(k)(2) ..................................................................94

40 C.F.R. § 93.150 ................................................................................64

40 C.F.R. § 1508.18(b)(1) ....................................................................108

49 C.F.R. § 1.95(a) ................................................................................79

49 C.F.R. § 520.4(b)(3)..........................................................................108

49 C.F.R. § 520.5(b)(9)..........................................................................108

49 C.F.R. § 520.5(b)(6)(i) ......................................................................108

49 C.F.R. § 520.5(b)(8)..........................................................................108


State regulations:


Cal. Admin. Code tit. 13 § 1955.1 (1975)..............................................90

Cal. Code Regs. tit. 13, § 1961.1.............................................................13

Cal. Code Regs. tit. 13, § 1961.3.............................................................20

Cal. Code Regs. tit. 13, § 1961.3(a) ........................................................13

Cal. Code Regs. tit. 13, § 1961.3(a)(1)....................................................13

Cal. Code Regs. tit. 13, § 1961.3(b)(3) ...................................................13

Cal. Code Regs. tit. 13, § 1962.2.............................................................20

**Page**

Cal. Code Regs. tit. 13, § 1960.1(g)(2) (1991) ....................12

Cal. Code. Regs. tit. 13, § 1961.3(b)(1) ....................13

Cal. Code. Regs. tit. 13, § 1961.3(c) ....................20

## FEDERAL REGISTER NOTICES

34 Fed. Reg. 7,348 (May 6, 1969) ....................43

36 Fed. Reg. 17,458 (Aug. 31, 1971) ....................53

36 Fed. Reg. 8,172 (Apr. 30, 1971) ....................12, 43

40 Fed. Reg. 23,102 (May 28, 1975) ....................87, 90

41 Fed. Reg. 44,209 (Oct. 7, 1976) ....................66

42 Fed. Reg. 13,807 (Mar. 14, 1977) ....................93

43 Fed. Reg. 11,995 (Mar. 23, 1978) ....................91

43 Fed. Reg. 25,729 (June 14, 1978) ....................11, 48, 53

44 Fed. Reg. 38,660 (July 2, 1979) ....................43

46 Fed. Reg. 5,022 (Jan. 19, 1981) ....................92

46 Fed. Reg. 24,952 (May 4, 1981) ....................92

49 Fed. Reg. 18,887 (May 3, 1984) ....................43, 48, 51, 53, 66

51 Fed. Reg. 31,173 (Sept. 2, 1986) ....................43

52 Fed. Reg. 20,777 (June 3, 1987) ....................43

# TABLE OF AUTHORITIES
(continued)

**Page**


53 Fed. Reg. 7,021 (Mar. 4, 1988) ........................................................................43

53 Fed. Reg. 11,074 (Apr. 5, 1988) ......................................................................91

54 Fed. Reg. 6,447 (Feb. 10, 1989) ......................................................................43

55 Fed. Reg. 43,028 (Oct. 25, 1990) ....................................................................43

56 Fed. Reg. 13,773 (Apr. 4, 1991) ......................................................................91

57 Fed. Reg. 24,788 (June 11, 1992) ....................................................................43

58 Fed. Reg. 4,166 (Jan. 13, 1993)................................................................ 12, 43

59 Fed. Reg. 36,969 (July 20, 1994) ......................................................................45

59 Fed. Reg. 48,625 (Sept. 22, 1994) ....................................................................43

60 Fed. Reg. 43,379 (Aug. 21, 1995)......................................................................31

61 Fed. Reg. 14,507 (Apr. 2, 1996) ......................................................................102

68 Fed. Reg. 16,868 (Apr. 7, 2003) ........................................................................91

69 Fed. Reg. 60,995 (Oct. 14, 2004) ......................................................................43

70 Fed. Reg. 50,322 (Aug. 26, 2005)......................................................................43

71 Fed. Reg. 17,566 (Apr. 6, 2006) ........................................................................91

71 Fed. Reg. 78,190 (Dec. 28, 2006)............................................................... 12, 43

73 Fed. Reg. 12,156 (Mar. 6, 2008) ........................................................................14

74 Fed. Reg. 32,744 (July 8, 2009)...................................................... 11, 14, 40, 42

74 Fed. Reg. 66,496 (Dec. 15, 2009)......................................................................54

Page

75 Fed. Reg. 25,324 (May 7, 2010) ........ 19

77 Fed. Reg. 62,624 (Oct. 15, 2012) ........ 20

78 Fed. Reg. 2,112 (Jan. 9, 2013) ........ 12

80 Fed. Reg. 13,768 (Mar. 17, 2015) ........ 12

80 Fed. Reg. 40,917 (July 14, 2015) ........ 12, 32

80 Fed. Reg. 50,203 (Aug. 19, 2015) ........ 32

80 Fed. Reg. 61,752 (Oct. 14, 2015) ........ 32

81 Fed. Reg. 39,424 (June 16, 2016) ........ 12, 32

81 Fed. Reg. 95,982 (Dec. 29, 2016) ........ 43

82 Fed. Reg. 42,233 (Sept. 7, 2017) ........ 12, 32

83 Fed. Reg. 16,077 (Apr. 13, 2018) ........ 60

84 Fed. Reg. 51,310 (Sept. 27, 2019) ........ 3

85 Fed. Reg. 24,174 (Apr. 30, 2020) ........ 22, 99

**LEGISLATIVE HISTORY**

113 Cong. Rec. 30,941 ff. (1967) ........ 7, 51, 52

123 Cong. Rec. 16,674 (1977) ........ 69

H.R. Rep. No. 90-728 (1967) ........ 6, 7

H.R. Rep. No. 94-340 (1975) ........ 14, 16, 87, 105

## TABLE OF AUTHORITIES
## (continued)

**Page**

H.R. Rep. No. 95-294 (1977) ........................................................ 9, 54, 105

H.R. Rep. No. 95-564 (1977) (Conf. Rep.) ........................................................ 51

H.R. Rep. No. 102-474 (1992) ........................................................ 17, 103

H.R. Rep. No. 110-297 (2007) ........................................................ 96

S. Rep. No. 90-403 (1967) ........................................................ 6, 34, 35, 50, 51, 52

**MISCELLANEOUS**

EPA, "Guidance for Implementing Section 141 of the Energy Independence and Security Act of 2007," Doc. EPA-420-B-19-049 (Sept. 19, 2019) ........................................................ 97

## GLOSSARY

| | |
|---|---|
| EISA | Energy Independence and Security Act of 2007 |
| EPA | U.S. Environmental Protection Agency |
| EPCA | Energy Policy and Conservation Act of 1975 |
| NHTSA | National Highway Traffic Safety Administration |

## INTRODUCTION

The U.S. Environmental Protection Agency (EPA) and National Highway Traffic Safety Administration (NHTSA) have sought to annul long-standing and vital state programs that improve air quality, protect public health, and reduce the catastrophic impacts of climate change. These attacks on core state police powers exceed the agencies' authorities, contravene congressional intent, and cannot stand.

California has long faced severe air pollution problems and has been setting emission standards for new motor vehicles since 1959—often regulating before, or more stringently than, the federal government. Congress has repeatedly and unequivocally affirmed California's authority to do so, concluding that both the State and the Nation benefit from California's expertise in this field and its service as a laboratory for regulatory and technological innovation. Accordingly, Congress required EPA to waive Clean Air Act preemption for California's—and only California's—vehicular emission standards, unless EPA makes one of three specified findings.

California's preemption waivers underpin a carefully designed regulatory structure enabling States to address vehicular pollution and achieve state and federal air pollution control goals. Congress has permitted other States to choose to implement California standards, and many States have done so.

Furthermore, as Congress anticipated, California and several other States have included the California standards in plans required by the Clean Air Act, and approved by EPA, that detail how States will meet, or continue to meet, federal air quality standards in the short and long term.

EPA and NHTSA now maintain that Congress silently granted them the authority to tear this pollution-reduction architecture asunder. Specifically, EPA withdrew the waiver it granted to California in 2013 for the State's greenhouse gas and zero-emission-vehicle standards. NHTSA promulgated a regulation declaring those same standards preempted by the Energy Policy and Conservation Act (EPCA). And EPA also concluded that other States cannot adopt or enforce California's greenhouse gas emission standards even when a waiver is in place.

Neither agency has authority for its actions. EPA has no power to withdraw a waiver at all and certainly cannot do so many years after the fact when significant reliance interests have attached. EPA likewise lacks authority to control which California standards other States may adopt or enforce. NHTSA similarly lacks authority to pronounce upon preemption under EPCA. And each agency's legal interpretations are wrong in any event.

EPA's and NHTSA's actions upend the very state authority Congress has repeatedly and expressly preserved—California's authority to develop its

innovative vehicular emissions program and other States' authorities to adopt that program as their own. Those state authorities must be restored.

## JURISDICTIONAL STATEMENT

Petitioners timely sought review of three agency actions published at 84 Fed. Reg. 51,310 (Sept. 27, 2019) (JA__-__[FinalAction51310-63]). *See, e.g.*, Case No. 19-1239 (filed Nov. 19, 2019). This Court has jurisdiction to review EPA's Waiver Withdrawal (JA__-__[FinalAction51328-50]) and Section 177 Determination (JA__-__[FinalAction51350-51]) under 42 U.S.C. § 7607(b)(1). Venue is proper because, *inter alia*, EPA based its actions "on a determination of nationwide scope or effect." JA__[FinalAction51351].

For reasons explained *infra*, at 74-78, this Court lacks jurisdiction to directly review NHTSA's Preemption Rule (JA__-__, __-__[FinalAction51311-28,51361-63]).

## ISSUES PRESENTED

**EPA's Waiver Withdrawal**

1. Whether EPA lacks authority for its Waiver Withdrawal.

2. Whether the interpretations and applications of Section 209(b)(1)(B) of the Clean Air Act, 42 U.S.C. § 7543(b)(1)(B), which are one basis for EPA's Waiver Withdrawal, are arbitrary, capricious, or otherwise contrary to law.

3. Whether EPA's reliance on NHTSA's Preemption Rule as a basis for the Waiver Withdrawal is arbitrary, capricious, or otherwise contrary to law.

**EPA's Section 177 Determination**

4. Whether EPA lacks authority to determine which California emission standards States may adopt or enforce under Section 177 of the Clean Air Act, 42 U.S.C. § 7507.

5. Whether EPA acted arbitrarily, capriciously, or contrary to law in determining that Section 177 is inapplicable to greenhouse gas emission standards.

**NHTSA's Preemption Rule**

6. Whether this Court lacks jurisdiction to directly review NHTSA's rule.

7. Whether NHTSA lacks authority to promulgate regulations that determine the scope of preemption under EPCA's fuel-economy chapter.

8. Whether the Preemption Rule is arbitrary, capricious, or otherwise contrary to law.

9. Whether NHTSA issued the Rule without observance of procedures required by the National Environmental Policy Act.

## STATUTES AND REGULATIONS

Pertinent statutes and regulations are reproduced in Volume A of the separate addendum to this brief.

## STATEMENT OF THE CASE

### A. State and Federal Regulation of Motor Vehicle Emissions

#### 1. Origins and Enactment of the Clean Air Act Waiver Provision

From the inception of the Nation's efforts to limit vehicular air pollution, California has led the way. The State's "interest in pollution control from motor vehicles dates to 1946," *Motor & Equip. Mfrs. Ass'n, Inc. v. EPA* (*MEMA I*), 627 F.2d 1095, 1109 n.26 (D.C. Cir. 1979), and California's legislature mandated statewide motor vehicle emission standards beginning in the 1950s. *See* 1959 Cal. Stat. 2091. By contrast, "[n]o federal statute purported to regulate emissions from motor vehicles until 1965." *MEMA I*, 627 F.2d at 1108; *see also* Pub. L. No. 89-272, § 202, 79 Stat. 992 (1965).

In the 1967 Clean Air Act Amendments, Congress preempted States from regulating emissions from new vehicles—"all, that is, except California." *MEMA I*, 627 F.2d at 1109. The Act's preemption clause generally provided that "[n]o State … shall adopt or attempt to enforce any standard relating to the control of emissions from new motor vehicles." Pub. L. No. 90-148, § 208(a), 81 Stat. 485, 501 (1967). But the Act also contained a "waiver

provision" specifying that EPA "shall" waive this preemption for California (i.e., for "any State" that had established certain vehicular emissions controls "prior to March 30, 1966") except in narrow circumstances described further below. *Id.* § 208(b), 81 Stat. at 501; *see also Engine Mfrs. Ass'n v. EPA*, 88 F.3d 1075, 1079 n.9 (D.C. Cir. 1996).[3]

The waiver provision reflected a unique and careful compromise between States' traditional pollution-control authorities and automakers' fears of "having to meet fifty-one separate sets of emissions control requirements." *MEMA I*, 627 F.2d at 1109. Congress also recognized the "harsh reality" of California's pollution problems, the substantial contributions motor vehicles make to those problems, and the State's expertise in regulating vehicular emissions. H.R. Rep. No. 90-728, at 96-97 (1967); *see also* S. Rep. No. 90-403, at 33 (1967). Congress recognized the "benefits for the Nation" from "new control systems" developed in response to California's technology-forcing standards and the "benefits for the people of California … from letting that State improve on its already excellent program of emissions control." *MEMA I*, 627 F.2d at 1109-10 (quotation marks omitted); *see also Engine Mfrs.*, 88 F.3d

[3] The 1967 Act gave this authority to the Secretary of Health, Education, and Welfare. In 1970, Congress transferred this authority to the Administrator of the newly created EPA. Pub. L. No. 91-604, § 15(c)(2), 84 Stat. 1676, 1713.

at 1080 (noting congressional intent that California serve as "a kind of laboratory for innovation" from which "the entire country would benefit").

Congress fiercely debated two versions of the waiver provision. The Senate version provided that the waiver "shall" be granted (absent certain limited findings), while the House version provided that it "may" be granted. *See* 113 Cong. Rec. 30,956-57 (1967); *see also id.* at 30,950, 30,952. Advocates of the Senate's "shall" language described it as a "guarantee" that California could regulate, *id.* at 30,952, with the "burden … on the [agency] to show why California … should not be allowed to go beyond the Federal limitations," H.R. Rep. No. 90-728, at 96. By contrast, they viewed the "may" language of the House version as placing California "at the mercy of the decision of one appointed head of a Federal department," forcing the State "to come with hat in hand to Washington." 113 Cong. Rec. at 30,941, 30,955; *see also* H.R. Rep. No. 90-728, at 96 ("Are we now to tell California that we don't quite trust her to run her own program, that big government should do it instead?").

Congress chose "shall." Thus, under the 1967 waiver provision, the agency "shall … waive application of" the preemption provision to California's standards unless it finds that California "does not require standards more stringent than applicable Federal standards to meet compelling and extraordinary conditions or that such State standards and accompanying

enforcement procedures are not consistent with section 202(a) of this title." Pub. L. No. 90-148, § 208(b), 81 Stat. at 501.

### 2. Subsequent Clean Air Act Amendments

The 1970 Clean Air Act Amendments strengthened EPA's authority to regulate vehicular "emission[s] of any air pollutant," while reaffirming the corresponding breadth of California's entitlement to regulate those emissions. Pub. L. No. 91-604, § 6(a), 84 Stat. at 1690 (amending Section 202 of the Clean Air Act); *see also id.* § 8(a), 84 Stat. at 1694 (recodifying the waiver provision as Section 209(b) of the Act). Congress also established the National Ambient Air Quality Standards program, under which EPA issues "air quality criteria" and sets standards for so-called "criteria" pollutants. States with regions that have not "attained" those federal air quality standards—called "nonattainment areas"—must submit State Implementation Plans indicating how they will do so or be subject to imposition of a federal plan. *Id.* § 4(a), 84 Stat. at 1678-80 (codifying Sections 108(a), 109(a), and 110(a) of the Clean Air Act). The National Ambient Air Quality Standards, and the multi-year, comprehensive planning required to meet them, are the "engine that drives" a sizable portion of the Clean Air Act's emission reductions. *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001).

When further amending the Clean Air Act in 1977, Congress noted with approval that EPA had construed the waiver provision with appropriate deference to California's policy goals, consistent with Congress's intent "to permit California to proceed with its own regulatory program" for new motor-vehicle emissions. H.R. Rep. No. 95-294, at 301 (1977). Congress also "ratif[ied] and strengthen[ed] the California waiver provision," *id.*, by removing the requirement that each California standard be "more stringent" than any federal standard. The amendment permitted California to adopt standards that "will be, *in the aggregate*, at least as protective" as EPA standards, Pub. L. No. 95-95, § 209(b)(1), 91 Stat. 685, 755 (1977) (emphasis added). This change allowed California to decide which pollutants are its highest priority, even when its decisions may require less stringent standards for other pollutants due to technological constraints. *MEMA I*, 627 F.2d at 1110 n.32; *see also* H.R. Rep. No. 95-294, at 301-02 (expressing intent "to afford California the broadest possible discretion in selecting the best means to protect the health of its citizens and the public welfare").

The amended waiver provision required EPA to waive preemption for standards California has determined are, in the aggregate, at least as protective as EPA standards, unless EPA finds that (1) California's protectiveness determination is arbitrary and capricious, (2) California "does not need such

State standards to meet compelling and extraordinary conditions," or (3) California's standards are not "consistent with" Section 202(a) of the Act, 42 U.S.C. § 7521(a)—meaning the standards are not technologically feasible. *Id.* § 7543(b)(1).

The 1977 amendments also heightened the importance of California's standards to the Nation as a whole. A new Section 177 of the Clean Air Act permitted other States addressing their own pollution problems to adopt and enforce California vehicular emission standards "for which a waiver has been granted." 42 U.S.C. § 7507. Any State with qualifying State Implementation Plan provisions may exercise this option and become a "Section 177 State," without any approval from EPA. *See id.*

When it amended the Clean Air Act in 1990, Congress essentially replicated the Section 209(b)(1) waiver provision in a new provision (Section 209(e)(2)) covering "nonroad" vehicles and engines. 42 U.S.C. § 7543(e)(2).

**3. California Waiver Standards**

As Congress intended, California has "expand[ed] its pioneering efforts" to reduce motor vehicle pollution in the half century since the waiver provision was enacted. *See MEMA I*, 627 F.2d at 1111. The State received its first waiver in 1968. Since then, California has adopted innovative standards, including the first vehicular emission standard for smog-forming oxides of nitrogen, 1968

Cal. Stat. 1463, 1467-70, and standards more stringent than EPA's, JA__-__, __, __[EPA-HQ-OAR-2018-0283_33-40_43_45]. As Congress intended, EPA "has drawn heavily on the California experience to fashion and to improve the national efforts at emissions control." *MEMA I*, 627 F.2d at 1110; *see also* JA__-__[EPA-HQ-OAR-2018-0283_44-48].

EPA has granted California almost every waiver the State has sought, applying the highly deferential review Congress "consciously chose" in order "to permit California to blaze its own trail with a minimum of federal oversight." *See Motor & Equip. Mfrs. Ass'n v. Nichols* (*MEMA II*), 142 F.3d 449, 463 (D.C. Cir. 1998). As EPA has frequently acknowledged, the statute "preclude[s]" the Administrator from substituting his judgment for that of California, and EPA has thus left "decisions on controversial matters of public policy, such as whether to regulate [certain] emissions, to California." *E.g.*, 43 Fed. Reg. 25,729, 25,731, 25,735-36 (June 14, 1978). EPA has also required "those favoring denial of the waiver [to] carry the burden of demonstrating that the waiver should not be granted," recognizing "that [EPA's] obligation is to grant the waiver if that burden is not met." *MEMA I*, 627 F.2d at 1120.

EPA has only *once* denied California a waiver in full, and it reversed that decision shortly thereafter. 74 Fed. Reg. 32,744, 32,745 (July 8, 2009); *see infra*, at 14. EPA has, in very limited circumstances, partially denied a waiver, usually

only as to certain model years because of concerns about technological feasibility within the lead time provided. *E.g.*, 36 Fed. Reg. 8,172 (Apr. 30, 1971) (partially denying waiver for one model year). Before now, EPA had never withdrawn a previously granted waiver.

#### 4. California's Zero-Emission-Vehicle Standards

Recognizing that vehicles with no tailpipe emissions (such as electric cars) would improve the State's air quality by dramatically reducing emissions of criteria pollutants, California established its first zero-emission-vehicle standard in 1990. Cal. Code Regs. tit. 13, § 1960.1(g)(2) (1991). The standard required a small but increasing percentage of cars sold in California to be zero-emission vehicles, beginning with the 1998 model year. *Id.* California has since extended and amended its zero-emission-vehicle standards, and EPA has always granted waivers for them. 58 Fed. Reg. 4166 (Jan. 13, 1993); 71 Fed. Reg. 78,190 (Dec. 28, 2006); 78 Fed. Reg. 2,112 (Jan. 9, 2013). Because zero-emission vehicles reduce emissions of criteria pollutants, EPA has also approved several States' inclusion of zero-emission-vehicle standards in State Implementation Plans to achieve National Ambient Air Quality Standards.[4]

---

[4] *E.g.*, 82 Fed. Reg. 42,233 (Sept. 7, 2017) (Maine); 81 Fed. Reg. 39,424, 39,425 (June 16, 2016) (California); 80 Fed. Reg. 40,917 (July 14, 2015) (Maryland); 80 Fed. Reg. 13,768 (Mar. 17, 2015) (Connecticut).

### 5. California's Greenhouse Gas Emission Standards

In 2002, California's Legislature found that "[g]lobal warming would impose on California, in particular, compelling and extraordinary impacts," including reductions in water supply, damage to the State's extensive coastline and ocean ecosystems, aggravation of existing and severe air quality problems and related adverse health impacts, increases in catastrophic wildfires, and threats to the State's economy, including its agricultural sector. 2002 Cal. Stat. c. 200 (A.B. 1493) (Digest). Recognizing that motor vehicles are "responsible for approximately 40 percent of the total greenhouse gas pollution in the state," *id.*, the Legislature directed the California Air Resources Board to regulate those emissions. Cal. Health & Safety Code § 43018.5(a). The Board did so in 2005. *See* Cal. Code Regs. tit. 13, § 1961.1.

California's standards operate on a fleetwide-average basis. Thus, each automaker must sell a fleet of vehicles in California that, on average, produces no more than the prescribed level of greenhouse gas emissions for the relevant model year. Cal. Code Regs. tit. 13, § 1961.3(a). Automakers can generate credits by selling fleets with average emissions below the standards or by selling certain zero-emission vehicles. *Id.* § 1961.3(b)(1). They can bank those credits for future compliance or sell them to other automakers. *Id.* § 1961.3(b)(3). The standards become stricter over time. *Id.* § 1961.3(a)(1).

During the George W. Bush Administration, EPA resisted California's authority to regulate vehicular greenhouse gas emissions and denied the State a waiver in 2008. 73 Fed. Reg. 12,156 (Mar. 6, 2008). It did so despite the Supreme Court's decision "that EPA has the statutory authority to regulate the emission of such gases from new motor vehicles," *Massachusetts v. EPA*, 549 U.S. 497, 532 (2007), and Congress's subsequent rejection of the Bush Administration's efforts to preempt state regulation of those emissions in the Energy Independence and Security Act of 2007, Pub. L. No. 110-140, 121 Stat. 1492 (EISA).

In 2009, EPA reversed its 2008 denial and granted California a Clean Air Act waiver for the State's greenhouse gas emission standards. 74 Fed. Reg. 32,744 (July 8, 2009).

### B. Federal Regulation of Vehicle Fuel Economy

Energy efficiency became a matter of intense public concern in the early 1970s. Motor vehicles were (and are) the Nation's single largest end user of petroleum, *see* H.R. Rep. No. 94-340, at 86 (1975), and demand for oil was greatly outpacing domestic production. For six months in 1973-74, several petroleum-exporting countries temporarily slashed production and embargoed exports to the United States. The ensuing energy crisis triggered a "tailspin in the domestic auto market," *Int'l Union v. Marshall*, 584 F.2d 390, 392 (D.C. Cir.

1978), and "dramatically underscored the nation's dependence on foreign sources of oil," *California v. Watt*, 668 F.2d 1290, 1295 (D.C. Cir. 1981).

In response, Congress enacted EPCA as "an omnibus measure that include[d] a myriad of provisions pertaining to the production, stockpiling, conservation, and pricing of energy resources." *Common Cause v. Dep't of Energy*, 702 F.2d 245, 246 (D.C. Cir. 1983); *see* Pub. L. No. 94-163, 89 Stat. 871 (1975) (EPCA). EPCA's fuel-economy chapter provided for reductions in oil consumption through "improved energy efficiency of motor vehicles," EPCA, § 2(5), 89 Stat. at 874, *codified as amended at* 42 U.S.C. § 6201(5), by way of a corporate average fuel-economy standard: "a performance standard which specifies a minimum level of average fuel economy" that each automaker's fleet must attain, *id.* § 301, 89 Stat. at 902, *codified at* 15 U.S.C. § 2001(7) (1976), *recodified as amended at* 49 U.S.C. § 32901(a)(6).[5]

Congress aimed to improve fuel economy of gasoline- and diesel-fueled passenger cars from 18.0 to 27.5 miles per gallon (mpg) of gasoline between model years 1978 and 1985. 15 U.S.C. § 2002(a)(1) (1976). But Congress understood that other motor vehicle standards, including emission standards, could affect fuel economy in both directions. In particular, while certain of

[5] Section 301 of EPCA was originally codified at 15 U.S.C. §§ 2001-2012 (1976) (ADD. A135-A145), and later reenacted as Chapter 329 of Title 49 of the U.S. Code (ADD. A108-A134).

California's vehicular emission standards led to improved fuel economy, other standards hampered fuel economy. *See* H.R. Rep. No. 94-340, at 86-87. Thus, although Congress itself prescribed average fuel-economy standards for passenger cars of model years 1978-80, it directed NHTSA to consider effects of "Federal standards"—defined to include California "emissions standards applicable by reason of section 209(b) of [the Clean Air] Act"—when modifying those particular fuel-economy obligations for individual petitioning automakers. 15 U.S.C. § 2002(d)(3)(D)(i) (1976). Congress then directed NHTSA to consider effects of "Federal motor vehicle standards" (later renamed "motor vehicle standards of the Government") when prescribing or modifying federal fuel-economy standards. *Id.* § 2002(e) (1976), *recodified as amended at* 49 U.S.C. § 32902(f).

At the same time, Congress opted to generally preempt any state or local "law or regulation relating to fuel economy standards or average fuel economy standards applicable to automobiles covered by [a federal fuel-economy standard]." 15 U.S.C. § 2009(a) (1976), *recodified as amended at* 49 U.S.C. § 32919(a). "Automobile" was defined as "a vehicle propelled by … gasoline and diesel oil," 15 U.S.C. § 2001(1), (5) (1976), the energy sources Congress most wanted to conserve.

In 1980, as an incentive to develop and commercialize electric vehicles, Congress amended EPCA such that deployment of those vehicles boosted automakers' average "fuel economy" without changing the fuel-economy standard that automakers needed to meet. Pub. L. No. 96-185, § 18, 93 Stat. 1324, 1336 (1980), *recodified as amended at* 49 U.S.C. § 32904(a)(2). In 1992, as California prepared to implement its first zero-emission-vehicle standard, Congress moved to "build on" the State's leadership, H.R. Rep. No. 102-474, pt. 1, at 136-37 (1992); *see also id.*, pt. 2, at 87, 90-91, by broadening EPCA's production incentive to include vehicles powered by electricity, hydrogen, and other alternative fuels, Pub. L. No. 102-486, § 403, 106 Stat. 2776, 2876 (1992). Congress implemented this change by adding those vehicles to the definition of "automobile," while continuing to bar NHTSA from considering them when setting federal fuel-economy standards. *Id.* § 403(2), 106 Stat. at 2876, *recodified as amended at* 49 U.S.C. § 32902(h).

Meanwhile, EPCA's fuel-economy program was languishing. NHTSA was authorized to raise fuel-economy standards for passenger cars of model years after 1984, *see* 15 U.S.C. § 2002(a)(4) (1976), but had not done so. In fact, for some model years, NHTSA had reduced standards *below* Congress's 27.5-mpg target for model year 1985. By 2007, Congress had seen enough, and it enacted EISA to update and reinvigorate EPCA.

EISA ordered NHTSA to increase fuel-economy standards for passenger cars to "at least" 35 miles per gallon by model year 2020 and to maximum-feasible levels thereafter. 49 U.S.C. § 32902(b)(2). EISA maintained the pre-existing requirement that NHTSA consider "the effect of other motor vehicle standards of the Government on fuel economy" when setting such standards. *Id.* § 32902(f).

Shortly before EISA's enactment, the Supreme Court had ruled that the Clean Air Act gives EPA authority to set vehicular emission standards for greenhouse gases, rejecting the claim that EPCA's fuel economy program displaced EPA's authority. *Massachusetts*, 549 U.S. at 528-29, 531-32. And two district courts had held that EPCA does not preempt California vehicular greenhouse gas emission standards that receive a Clean Air Act waiver. *Green Mountain Chrysler Plymouth Dodge Jeep v. Crombie* (*Green Mountain*), 508 F. Supp. 2d 295, 354, 398 (D. Vt. 2007); *Cent. Valley Chrysler-Jeep, Inc. v. Goldstene* (*Central Valley*), 529 F. Supp. 2d 1151, 1175, 1179 (E.D. Cal. 2007) (as corrected Mar. 26, 2008).

In enacting EISA, Congress rejected amendments to abrogate those cases' recognition of EPA's and California's authority to regulate vehicular greenhouse gas emissions. *See* JA__-__[EPA-HQ-OAR-2018-0283-4132_AppxA_3-17]. Instead, Congress adopted a savings clause providing that

nothing in EISA limited "the authority provided by … any … environmental law" absent an express contrary statement in the Act. 42 U.S.C. § 17002. Further, Congress anticipated that EPA would also regulate vehicular greenhouse gases. Thus, EISA directed EPA to base federal vehicle procurement policies on "the most stringent standards for vehicle greenhouse gas emissions applicable to … vehicles sold anywhere in the United States." 42 U.S.C. § 13212(f)(3)(B).

### C. A Harmonized National Program

After EPA granted California a Clean Air Act waiver for greenhouse gas emission standards in 2009, EPA, NHTSA, and California decided to create a "National Program" under which EPA and California would align their respective greenhouse gas emission standards for light-duty vehicles and NHTSA would harmonize its fuel-economy standards with those emission standards. This approach was not mandated by law, but EPA and NHTSA adopted it in their discretion in order to "deliver[ ] environmental and energy benefits, cost savings, and administrative efficiencies on a nationwide basis that might not be available under a less coordinated approach." 75 Fed. Reg. 25,324, 25,545 (May 7, 2010). Automakers supported the approach. *Id.* at 25,328.

In 2012, the National Program was extended to additional model years. EPA and NHTSA completed a rulemaking to adopt their harmonized emission

and fuel-economy standards, respectively. 77 Fed. Reg. 62,624 (Oct. 15, 2012). That same year, California adopted its Advanced Clean Cars program—an integrated program including criteria-pollutant, greenhouse gas, and zero-emission-vehicle standards applicable to light-duty vehicles. Cal. Code Regs. tit. 13, §§ 1961.3, 1962.2. Federal and state greenhouse gas emission standards remained aligned. *See* 77 Fed. Reg. at 62,637. California also included a provision under which manufacturers would be deemed to meet the State's standards if they complied with EPA's aligned standards. Cal. Code. Regs. tit. 13, § 1961.3(c).

In 2013, EPA granted California a waiver for its Advanced Clean Cars program for model years 2017 and later, including the State's greenhouse gas and zero-emission-vehicle standards. JA__[R-7839_2115]. EPA found, among other things, that California needs its motor vehicle emissions program *both* to address serious air quality challenges with pollutants like particulate matter and ozone *and* to address serious impacts from climate change. JA__[R-7839_2129]. Twelve States have since followed California's lead pursuant to Section 177.

**D. The Challenged Actions**

In August 2018, EPA and NHTSA proposed multiple unprecedented actions to invalidate state vehicular emission standards. JA__[ProposedAction42986]. First, EPA proposed to withdraw the parts of

California's 2013 waiver that concerned greenhouse gas and zero-emission-vehicle standards for model years 2021 and later. JA__[ProposedAction43242]. Second, EPA proposed to interpret Section 177 to preclude other States from adopting or enforcing California's greenhouse gas emission standards—but not its zero-emission-vehicle standards—even if California had a waiver. JA__[ProposedAction43253]. Third, NHTSA proposed a regulation declaring that state greenhouse gas and zero-emission-vehicle standards are preempted by EPCA. JA__[ProposedAction42999]. The agencies also proposed to freeze federal greenhouse gas emission and fuel-economy standards at model year 2020 levels through at least model year 2026. JA__[ProposedAction42986].

On September 27, 2019, the agencies finalized EPA's Waiver Withdrawal, EPA's Section 177 Determination, and NHTSA's Preemption Rule. JA__[FinalAction51310]. EPA based its Waiver Withdrawal on its determination that California does not "need" its greenhouse gas and zero-emission-vehicle standards under Section 209(b)(1)(B), and on the existence of NHTSA's Preemption Rule. JA__[FinalAction51328]. Based on that latter ground, EPA expanded the scope of its Waiver Withdrawal beyond the proposal to cover all model years, not just 2021 and later. *Compare* JA__[FinalAction51338] *with* JA__[ProposedAction43240]. EPA and NHTSA did not finalize the rollback of their own standards until April 2020. *See* 85 Fed.

Reg. 24,174 (Apr. 30, 2020). Petitioners here are challenging that rollback in separate litigation in this Court. *E.g.*, *California v. Wheeler*, D.C. Cir. No. 20-1167 (filed May 27, 2020).

## STANDARD OF REVIEW

The Administrative Procedure Act prescribes the scope of judicial review of NHTSA's and EPA's actions because no statute prescribes another standard of review. *See Alaska Dep't of Envtl. Conservation v. EPA*, 540 U.S. 461, 496 & n.18 (2004); U.S. Opp'n. to Mots. for Abeyance at 12, ECF No. 1823683 (Jan. 10, 2020) (noting that Section 307(d) of the Clean Air Act, 42 U.S.C. § 7607(d), does not govern review of EPA's Waiver Withdrawal). This Court "shall … hold unlawful and set aside agency action" found to be "in excess of statutory … authority," "arbitrary, capricious, … or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A), (C).

## SUMMARY OF ARGUMENT

EPA and NHTSA have taken unprecedented and unauthorized actions to invalidate long-standing and crucial state programs—including state zero-emission-vehicle standards first adopted thirty years ago. These attacks on state authority to protect public health and reduce the enormous threats of climate change are unauthorized and unfounded.

1. a. EPA lacks authority for its Waiver Withdrawal. The Clean Air Act gives the agency narrowly circumscribed authority to deny California a waiver in the first instance. That authority to prevent the State's vehicular emission standards from taking effect does not imply the greater power to preempt state standards after they have taken effect. Indeed, that action would disrupt congressional design and have cascading and consequential effects for sovereign States, public health protections, and a wide array of businesses inside and outside the automotive sector. EPA has no delegated authority to withdraw a waiver under any circumstance. And it certainly has no authority to withdraw a waiver, as it did here, by choosing to revisit policies embedded in long-standing statutory interpretations and agency practices and to apply its new policies to a six-year-old decision that has engendered substantial reliance interests.

b. Both grounds for EPA's Waiver Withdrawal are invalid. EPA's new determination that California's greenhouse gas and zero-emission-vehicle standards are not "need[ed] … to meet compelling and extraordinary conditions" within the meaning of Section 209(b)(1)(B), 42 U.S.C. § 7543(b)(1)(B), is wrong. Historically, EPA has correctly interpreted this provision to afford California broad discretion to design a pioneering motor vehicle emission program. EPA's new interpretation impermissibly varies based

on whether the regulated pollutant has "global" rather than "local" effects and serves only to prohibit application of the waiver provision to the former category. This interpretation is unlawful, and California has demonstrated a need for its greenhouse gas and zero-emission-vehicle standards to address the severe threats it faces from climate change. Moreover, even under EPA's new and unlawful reading of Section 209(b)(1)(B), the agency cannot deny (much less withdraw) a waiver for these standards, which the State needs to meet its long-standing challenges with local air quality.

c. EPA's other basis for its Waiver Withdrawal—NHTSA's Preemption Rule—likewise cannot support its action. That rule itself is unlawful. And EPA has not explained its decision to deviate, only for purposes of this single waiver proceeding, from its unbroken practice of basing waiver decisions exclusively on the criteria listed in Section 209(b)(1) of the Clean Air Act, none of which concerns preemption under EPCA.

2. EPA's determination that Section 177 of the Clean Air Act, 42 U.S.C. § 7507, does not permit other States to adopt or enforce California's greenhouse gas emission standards is also unauthorized and unlawful. Congress empowered States, and States alone, to decide whether to follow California's lead. And Section 177 unambiguously authorizes eligible States to adopt California's standards for vehicular emissions of *any* pollutant.

3. a. This Court lacks original jurisdiction to review NHTSA's Preemption Rule and should dismiss the petitions insofar as they protectively sought review of it. The Clean Air Act does not provide jurisdiction over NHTSA's action, and EPCA restricts direct appellate review to regulations prescribed under specific statutory sections that do not address preemption.

b. If this Court concludes that it has jurisdiction to review the Preemption Rule, it should vacate the Rule because it exceeds NHTSA's authority. NHTSA has no delegated authority to pronounce upon preemption and cannot promulgate regulations on the subject.

c. NHTSA erred in concluding that EPCA preempts state greenhouse gas and zero-emission-vehicle standards for which EPA grants California a waiver. Congress deliberately preserved these emission standards in the Clean Air Act, accommodated them in EPCA, and confirmed their continuing validity in more recent enactments. NHTSA's arguments to the contrary ignore the plain text, structure, and history of all these enactments; and the agency's reasons for declaring greenhouse gas and zero-emission-vehicle standards preempted are contrary to the law and the record. EPCA's express preemption clause, 49 U.S.C. § 32919(a), does not displace these state emission standards, and principles of conflict preemption lead to the same conclusion.

d. NHTSA violated the National Environmental Policy Act by not preparing any environmental document for its rule.

## STANDING

The challenged agency actions purport to preempt States from adopting or enforcing standards to control vehicular emissions of carbon-dioxide and other greenhouse gases. *See, e.g.*, ADD. B049-B056. That preemption injures State Petitioners as sovereigns in a manner cognizable under Article III and redressable by vacatur of the actions. *See Alaska v. DOT*, 868 F.2d 441, 443-44 (D.C. Cir. 1989).

The challenged actions also injure Petitioners by increasing greenhouse gas emissions and, thus, exacerbating impacts of climate change, including loss of sovereign territory, increased costs to public health programs, damage to state-owned parks and infrastructure, reduced property values, more frequent and severe wildfires and extreme weather events, impairment of agricultural production and other vital economic activity, increased ozone formation, and reduced recreational opportunities. JA__-__[EPA-HQ-OAR-2012-0562-0011_75-79]; ADD. B007-B010, B013-B024, B027-B032, B035-B041, B087-B101, B104-B111, B123-B162, B163-B167, B169-B190, B197-B200, B203-B206, B209-B221, B234-B238, B268-B269, B272-B273, B279-B289, B296-B303, B306-B307.

By preempting laws that expand sales of zero- and low-emission vehicles, *see* JA___-___[EPA-HQ-OAR-2012-0562-0011_ES-3-4], the challenged actions also increase emissions of criteria pollutants and their precursors. The resulting increased concentrations of both criteria pollutants and greenhouse gases will injure State and Local Government Petitioners by hampering attainment of federal and state mandates, increasing regulatory burdens and costs, and increasing healthcare costs. ADD. B003-B010, B016-B019, B034-B042, B045-B048, B053-B055, B060-B078, B080-B087. These emissions also injure members of Public-Interest Petitioners. ADD B103-B119, B169-B171, B173, B187-B194, B199-B200, B209-B210, B222-B224, B241-B243, B246-B249, B268-B269, B280-B291, B294, B301-B302. The challenged actions also reduce availability of the zero- and low-emission vehicles that members of Public-Interest Petitioners plan to sell or purchase, and harm associated businesses. ADD. B107-B109, B119-B120, B189, B194-B195, B200-B201, B209-B210, B238-B240, B258-B260, B266, B269-B278, B287-B294, B297-B300, B309-B318.

## ARGUMENT

### I. EPA'S WAIVER WITHDRAWAL IS UNLAWFUL

EPA's Waiver Withdrawal should be vacated because it exceeds the agency's authority and because both bases for the withdrawal—EPA's

determination under Section 209(b)(1) of the Clean Air Act and its reliance on NHTSA's Preemption Rule—are unlawful.

### A. EPA Lacks Authority for Its Waiver Withdrawal

EPA has no authority to withdraw a previously granted waiver. Such withdrawals are not authorized—explicitly or implicitly—by Section 209(b)(1), and EPA's attempts to find support outside that section fail. Moreover, even if EPA had some implicit authority to withdraw a waiver, the circumstances of and bases for *this* Waiver Withdrawal exceed any such authority.

#### 1. Section 209(b)(1) Does Not Authorize Waiver Withdrawals

Section 209(b)(1) provides no explicit withdrawal authority. It refers only to EPA's action to "grant[]" or not grant California's waiver request. 42 U.S.C. § 7543(b)(1). The text does not refer to, let alone authorize, waiver withdrawals.

EPA claims "inherent authority" to withdraw waivers. JA__[FinalAction51331]. But EPA is "a creature of statute" with "only those authorities conferred upon it by Congress." *Michigan v. EPA*, 268 F.3d 1075, 1081 (D.C. Cir. 2001). It lacks "*any* inherent authority" and may act "only if some provision or provisions of the [Clean Air] Act explicitly or implicitly grant it power to do so." *HTH Corp. v. NLRB*, 823 F.3d 668, 679 (D.C. Cir. 2016). Congress's failure to expressly withhold a particular power is not a source of statutory authority, *Michigan*, 268 F.3d at 1082, and principles of separation of

powers and federalism provide special reason to adhere to limits on a federal agency's authority to preempt preexisting state law, *see La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986).

Section 209(b)(1) provides no implicit withdrawal authority. The Clean Air Act preserves state authority to regulate emissions unless expressly "provided" otherwise. 42 U.S.C. § 7416. In statutes like this where preemption is the exception, only Congress's "precise terms" can produce preemption. *CTS Corp. v. Waldburger*, 573 U.S. 1, 12-13 (2014). Section 209(b)(1)'s precise terms mandate that EPA "shall" grant California a waiver unless EPA finds one of the three specified bases for denial. This language charges EPA "with undertaking a single review in which [the Administrator] applies the deferential standards set forth in Section 209(b) to California and either grants or denies a waiver." *Ford Motor Co. v. EPA*, 606 F.2d 1293, 1302 (D.C. Cir. 1979). It evinces no intent to provide EPA with the different and greater authority to withdraw a previously granted waiver, thereby arresting the State's ongoing implementation of its own laws.

Withdrawal of a previously granted waiver upends serious reliance interests. For example, once California has a waiver for standards to reduce vehicular emissions, it incorporates those anticipated reductions into plans and regulations to achieve state and federal air pollution goals, and businesses

operating in California base their own long-term plans on the State's policies. JA__, ___-___, ___[EPA-HQ-OAR-2018-0283-5054_283,301-02,342]. None of these plans can change on a dime. If anticipated emission reductions will not materialize from the automobile sector because EPA withdraws a waiver, California must consider requiring further reductions from other sectors of the economy. *See id.* Those reductions may or may not be adequate or even possible in the relevant timeframes, and the State may be unable to protect its residents and natural resources as planned. Thus, the withdrawal of a waiver has far-reaching ripple effects—for the State, its residents, and its businesses—well beyond those of a denial of a waiver.

Moreover, these reliance interests extend beyond California owing to Section 177 of the Clean Air Act, which allows other, qualifying States to choose California's vehicular emission standards over the otherwise applicable federal standards. Congress, thus, "permit[ted] other states desiring more stringent air quality control measures to 'piggyback' on California's exemption" from preemption. *Motor Vehicle Mfrs. Ass'n, Inc. v. NYSDEC*, 79 F.3d 1298, 1302 (2d Cir. 1996). Accordingly, other States rely on California's standards as part of their own long-term plans and regulations to protect state residents and natural resources.

Congress also invited California and the Section 177 States to include the California standards in State Implementation Plans to meet federal air quality requirements. *E.g.*, 42 U.S.C. §§ 7410(a)(2)(D), 7502(c)(1); *see also Comm. for a Better Arvin v. EPA*, 786 F.3d 1169, 1176 (9th Cir. 2015). Many States have done so, and EPA has routinely approved such plans. *E.g.*, 60 Fed. Reg. 43,379 (Aug. 21, 1995). Reliance interests in State Implementation Plans are particularly acute. They set expectations for extended periods of time and for many sectors of the economy, making it challenging (if not impossible) to change them quickly. And planning failures can carry significant consequences, including the imposition of federal plans that limit local flexibility and control, as well as penalties such as loss of highway funds. 42 U.S.C. §§ 7410(c)(1) (establishing triggers for imposition of federal plan), 7509 (outlining sanctions for state planning failures).

Put simply, Congress intended that multiple sovereign States would act in reliance on a granted waiver and *explicitly* authorized them to do so. EPA does not, and cannot, explain why Congress would *implicitly* authorize EPA to upend all of those States' reliance interests, upset the expectations of regulated industries in those States, and jeopardize the Clean Air Act's pollution-control objectives. Indeed, far from implicitly authorizing EPA to cause failures in State Implementation Plans to meet federal air quality standards, Congress

explicitly prohibited EPA and other federal agencies from doing so. *See* 42 U.S.C. § 7506(c)(1); *see also id.* § 7401. EPA's assertion of "inherent" authority to withdraw previously granted waivers is incompatible with the regulatory regime Congress designed.

The consequences of EPA's claimed authority for Congress's regime are aptly demonstrated here. EPA has approved at least five State Implementation Plans that include one or more of the California standards for which EPA has now withdrawn the waiver.[6] Thus, the Waiver Withdrawal effectively prohibits these States from enforcing state laws on which their EPA-approved plans depend. EPA downplays these consequences, in a footnote, as mere "implications." JA__[FinalAction51338] n.256. But Congress did not *implicitly* authorize EPA to create such disruptive and damaging "implications" for sovereign States and their considered efforts to reduce harmful air pollution. *See Am. Methyl Corp. v. EPA*, 749 F.2d 826, 840 (D.C. Cir. 1984) (rejecting "implied power" as "contrary to the intention of Congress and the design of" the Act).

[6] 82 Fed. Reg. 42,233 (Sept. 7, 2017) (Maine); 81 Fed. Reg. 39,424 (June 16, 2016) (California); 80 Fed. Reg. 61,752 (Oct. 14, 2015) (Delaware); 80 Fed. Reg. 50,203 (Aug. 19, 2015) (Rhode Island); 80 Fed. Reg. 40,917 (July 14, 2015) (Maryland).

### 2. EPA Fails to Identify Any Other Support for Its Purported Withdrawal Authority

EPA contrasts the Section 209(b)(1) waiver process with California's exemption from preemption for *fuel* emission standards, which requires no waiver from EPA. JA__[FinalAction51331]; *see also* 42 U.S.C. § 7545(c)(4)(B). But Congress's choice not to require a waiver for California's *fuel* emission standards does not support EPA's claimed authority to withdraw a waiver for California's *vehicular* emission standards. Moreover, Congress knows how to authorize EPA to stop state laws that are already in effect and did so expressly elsewhere in the Clean Air Act. *E.g.*, 42 U.S.C. § 7545(c)(4)(A) (authorizing EPA to preempt by regulation or determination).[7] This Court should decline to find implicit authority where similar authority was "elsewhere … expressly granted." *See Whitman*, 531 U.S. at 467.

EPA continues with apples-to-oranges comparisons, arguing that it must have waiver withdrawal authority because it has authority to revise its own, federal vehicular emission standards. JA__[FinalAction51332]. But, by constitutional and statutory design, EPA's role with respect to *state* standards

[7] That Congress *explicitly* authorized EPA to *approve* an otherwise preempted state fuel emission standard as part of a State Implementation Plan, 42 U.S.C. § 7545(c)(4)(C)(i), does not establish that Congress *implicitly* authorized EPA to *withdraw* a Section 209(b)(1) preemption waiver, especially one on which such plans depend. *See* JA__[FinalAction51331].

bears no resemblance to its authority over *federal* standards. Congress respected and preserved those boundaries, providing *California*, not EPA, "with the broadest possible discretion" over the State's standards. *MEMA I*, 627 F.2d at 1113.[8] Section 209(b)(1) "defines the relevant functions of EPA" with respect to California's standards, and that "specific statutory directive" limits EPA's authority. *Michigan*, 268 F.3d at 1084.

Finally, EPA cites one sentence of legislative history from 1967 suggesting the agency could withdraw a waiver "'if California no longer complies with the conditions of the waiver.'" JA__[FinalAction51332] (quoting S. Rep. No. 90-403, at 34). This hardly establishes that EPA has general authority to withdraw a previously granted waiver, let alone that it has authority to do so because it now believes certain standards no longer meet redefined waiver criteria. Rather, the statement and those surrounding it focus on the State's conduct: its compliance with waiver conditions and, specifically, its cooperation with EPA

[8] Accordingly, state, not federal, law provides administrative remedies regarding state standards—including for automakers alleging that the standards are infeasible. *See* Cal. Gov't Code § 11340.6 (authorizing petitions "requesting the adoption, amendment, or repeal of a regulation"); Cal. Civ. Proc. Code § 1085 (authorizing courts "to compel the performance of an act which the law specially enjoins"). There is, thus, no need to "infer [federal] authority to reconsider" state standards. *See Am. Methyl*, 749 F.2d at 835. This Court should not assume that Congress implicitly intended to supplement or supplant state law remedies.

concerning enforcement and certification procedures. S. Rep. No. 90-403, at 34. *This* Waiver Withdrawal is not based on any such conduct or "conditions" of the waiver with which California is purportedly not complying.[9] In any event, Congress has amended and strengthened the waiver provision since 1967 and has expanded the availability of California's standards to the Section 177 States without any indication that EPA was authorized to upend either the States' efforts to reduce air pollution and protect their residents or the States' natural and consequential reliance interests in standards for which a waiver had been granted.

Finally, the thrust of the waiver provision's 1967 and later legislative history sharply undermines EPA's claim to withdrawal authority. Congress rejected the notion that California should be "at the mercy" of a federal agency. *See, supra*, at 7. And Congress intended California to drive technological innovation from which the entire Nation would ultimately benefit. *See* S. Rep. No. 90-403, at 33; *see also MEMA I*, 627 F.2d at 1111. That intention cannot be

[9] EPA describes several actions it claims California has recently taken but clarifies that they are not "bases for" the Waiver Withdrawal and that the agency "would be taking this action even in their absence." JA__[FinalAction51334]. EPA "must defend its actions based on the reasons it gave when it acted." *DHS. v. Regents of the Univ. of Cal.*, -- S. Ct. --, 2020 WL 3271746, at *11 (June 18, 2020).

reconciled with the regulatory uncertainty created by the prospect of a waiver withdrawal. *See Am. Methyl*, 749 F.2d at 839-40.

EPA has no waiver withdrawal authority.

### 3. Even If EPA Had Some Withdrawal Authority, These Circumstances Do Not Support Its Exercise

Even assuming that EPA has authority to withdraw a waiver under certain circumstances, it had no authority to do so here, years after its grant and based solely on new legal interpretations reflecting the policy preferences of a new presidential administration.

In proposing its Waiver Withdrawal, EPA asserted that its "review" of the 2013 waiver grant was "undertaken in response to" a change in administration and "reflect[ed] changed circumstances" since that time. JA__-___[ProposedAction43242-43] (quotation marks omitted). In its final action, however, EPA relied exclusively on its purported discretion to reinterpret Section 209(b)(1)(B) of the Clean Air Act, *see* JA__[FinalAction51340], and its purported discretion to consider factors not enumerated in Section 209(b)(1), *see* JA__[FinalAction51338]. These avowedly discretionary policy changes cannot support reversal of a six-year-old decision EPA identifies as adjudicatory, JA__[R-7839_2145], and to which substantial reliance interests have attached. *See Chapman v. El Paso Nat. Gas Co.,* 204 F.2d 46, 53-54 (D.C. Cir. 1953) (rejecting authority to reverse earlier adjudication based on a "change

in administrative policy, particularly where" justifiable reliance interests are present); *see also United States v. Seatrain Lines Inc.*, 329 U.S. 424, 429 (1947) (rejecting authority to apply "new policy" retroactively to previously granted certificate).[10]

In part because of reliance interests, any such authority must be exercised within a "reasonable time"—which, "absent unusual circumstances," "would be measured in weeks, not years." *Mazaleski v. Treusdell,* 562 F.2d 701, 720 (D.C. Cir. 1977). By contrast, EPA's action comes years after the waiver was granted, years after multiple sovereign States adopted California's standards, and years into long-term plans States developed in reliance on anticipated emission reductions from those standards—including, but not limited to, multiple EPA-approved State Implementation Plans. EPA's failure to "assess" these reliance interests, "determine whether they were significant, and weigh any such interests against competing policy concerns" also renders its decision to

[10] Notably, the factual conditions that EPA asserts *could* support a waiver withdrawal do not exist here. For example, EPA suggests it must have authority to withdraw a waiver if California's standards later prove technologically infeasible. JA____[FinalAction51332]. But EPA expressly declined to make any feasibility findings here. JA___[FinalAction51,330] n.215.

exercise withdrawal authority arbitrary and capricious. *DHS v. Regents of the Univ. of Cal.*, -- S. Ct. --, 2020 WL 3271746, at *15 (June 18, 2020).[11]

EPA attempts to mask the unreasonableness of its delay, and its application of new policies and statutory constructions to a 2012 request, by asserting that the Waiver Withdrawal affects only future model year vehicles. JA__[FinalAction51337]. But this is simply false. Insofar as EPA relied on NHTSA's Preemption Rule, the Waiver Withdrawal encompassed past and current model years as well. JA__[FinalAction51338].[12]

Moreover, EPA purported to base its action on California's waiver request as "originally presented" in 2012, JA____[FinalAction51350n284], reconsidering that six-year-old record in light of EPA's own post-decisional

---

[11] EPA's advance commitment to reevaluate its *own* emission standards does not negate reliance interests in *California's* standards. *See* JA____[FinalAction51335]. In any event, public awareness that regulations may change does not obviate reliance interests in those regulations. *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (recognizing that agencies may change rules prospectively and that important reliance interests nonetheless attach).

[12] Remarkably, EPA does not attempt to claim authority to withdraw the waiver for model years before 2021. JA__[FinalAction51337] (asserting authority "to withdraw the waiver for MY 2021–2025"); *see also* JA_____[ProposedAction43252] (asserting withdrawal for earlier years would cause hardship to manufacturers). That deficiency, combined with EPA's unnoticed expansion to earlier model years, *cf.* JA__[ProposedAction43240], establishes that at least the model year 2017-2020 portion of EPA's Waiver Withdrawal must be vacated. *See CSX Transp., Inc. v. STB*, 584 F.3d 1076, 1081 (D.C. Cir. 2009) (vacating action where "agency had completely changed its position" between proposal and finalization).

reinterpretations of the statute, JA___[ProposedAction43243]. The agency cannot simultaneously cast its decision as prospective. In any event, timeliness for reconsidering an adjudication is measured from the date of the agency's decision, not from the date of activity resulting from that decision. *E.g.*, *Am. Methyl*, 749 F.2d at 835 (tethering timeliness to period for appeal of agency decision). And EPA's assertion that the effects of its 2013 waiver grant have "not yet ripened" ignores the numerous and multi-layered reliance interests described above. *See* JA__[FinalAction51337].

In short, EPA lacks authority to withdraw a previously granted waiver and most certainly lacks authority for the withdrawal action it took here.

### B. EPA's Section 209(b)(1)(B) Determination Is Unlawful

Even if EPA had authority for its Waiver Withdrawal, that action would still be unlawful because neither of the two bases on which it rests can be upheld. EPA's first basis—its determination that California "does not need" its greenhouse gas and zero-emission-vehicle standards "to meet compelling and extraordinary conditions" under Section 209(b)(1)(B), 42 U.S.C. § 7543(b)(1)(B)—is wrong for three reasons.

First, for some pollutants but not others, EPA unreasonably abandoned its traditional program-level approach to Section 209(b)(1)(B)'s "need" inquiry, opting instead to second-guess California's need for each individual standard.

Second, EPA erroneously determined that the State does not need its greenhouse gas or zero-emission-vehicle standards to address climate change and its impacts, by unreasonably interpreting Section 209(b)(1)(B) as imposing a categorical bar to waivers for standards that regulate greenhouse gas emissions—pollution that poses an existential threat to California and its residents. Third, EPA disregarded record evidence and arbitrarily and capriciously determined that these standards are not needed to support the State's long-running and concerted efforts to address its serious air quality problems.

### 1. EPA Improperly Rejected Its Traditional Program-Level Analysis in Favor of a Pollutant-Specific Interpretation

Section 209(b)(1)(B) permits EPA to deny a waiver request if it determines that California "does not need such State standards to meet compelling and extraordinary conditions." For more than fifty years (with one exception it later reversed), EPA has interpreted this provision as asking whether California "needs to have its own separate motor vehicle program" as a whole, "not whether the state needs the specific standards under consideration." JA__[FinalAction51346]. EPA has repeatedly affirmed this interpretation, over objections, concluding it is "the most straightforward reading of the text and legislative history." *E.g.*, 74 Fed. Reg. at 32,761.

EPA now selectively departs from its historical interpretation for the sole purpose of preempting "California's [greenhouse gas] related standards." JA__[FinalAction51347]. EPA deems it "appropriate" to consider *those* standards individually, separate from the State's whole motor vehicle program. *Id.* Yet EPA admits that it plans to continue "to examine California's program as a whole [for standards] designed to address local or regional air pollution problems." JA__[ProposedAction43247]; *see also* JA___[FinalAction51341n263]).[13] EPA's contrived statutory interpretation is impermissible for several reasons.

*First*, the Supreme Court has rejected this "novel interpretive approach" of assigning different meanings to the same statutory text in the same provision, depending on the application, because it "would render every statute a chameleon." *Clark v. Martinez*, 543 U.S. 371, 382 (2005); *see also United States v. Santos*, 553 U.S. 507, 522 (2008) (plurality opinion) ("forcefully" rejecting this "interpretive contortion").[14] The phrase "such State standards" cannot be

---

[13] Notably, both California's greenhouse gas and zero-emission-vehicle standards reduce emissions of other (criteria) pollutants as well. *See, infra,* at 59-63. There is, thus, no factual basis for the distinction that EPA purports to draw here.

[14] Contrary to EPA's assertions, *Utility Air Regulatory Group v. EPA*, 573 U.S. 302 (2014), does not support multiple interpretations of a single phrase in a single statutory provision. *See* JA__[FinalAction51340]. There, the Court held that the same phrase (e.g., "any air pollutant") might take on different meanings in *different* provisions, depending on their particular contexts. 573 U.S. at 320.

interpreted to refer to an individual standard for some applications of Section 209(b)(1)(B) (i.e., a standard regulating greenhouse gas emissions) but to California's whole motor vehicle emissions program for other applications (i.e., all other standards).

*Second,* EPA's selective single-standard approach conflicts with the text of Section 209(b)(1)(B). Congress used the plural "standards" in that provision while using the singular "standard" elsewhere, including in Section 209 itself. *E.g.*, 42 U.S.C. § 7543(a), (b)(2); *see generally Life Techs. Corp. v. Promega Corp.*, 137 S. Ct. 734, 741-42 (2017) (assigning interpretive meaning to Congress's use of plural and singular). EPA also ignores that Section 209(b)(1)(B)'s "need" criterion is "logically tied," *MEMA I*, 627 F.2d at 1113, to the requirement that California determine its standards are "*in the aggregate*, at least as protective" as EPA's standards, 42 U.S.C. § 7543(b)(1) (emphasis added). Congress designed that protectiveness inquiry to focus on California's standards *collectively* so that the State could "promulgate individual standards that are not as stringent as comparable federal standards" as part of a larger program that, on the whole, is equally or more protective. 74 Fed. Reg. at 32,761. As EPA previously and correctly concluded, "[t]his decision by Congress requires EPA to allow California to promulgate individual standards that, in and of themselves, might not be considered needed to meet compelling and extraordinary

circumstances." *Id.* EPA's new interpretation of the "need" criterion as permitting standard-by-standard analysis conflicts with the approach Congress expressly required for the protectiveness criterion to which it is logically tied.

*Third*, Congress has affirmed EPA's historical "whole program" approach to the "need" inquiry. This approach has been applied from the earliest days of waiver proceedings (which predated EPA's creation), when California was summarily found to need "*standards* more stringent than" the federal government's. 34 Fed. Reg. 7,348 (May 6, 1969) (emphasis added) (pre-EPA); *see also* 36 Fed. Reg. 8,172 (Apr. 30, 1971) (EPA). EPA has maintained this approach since then, explicitly rejecting requests to consider California's need for individual standards on multiple occasions.[15]

Tellingly, Congress has "amended various parts of [the Clean Air Act] over the years, including the specific provision at issue here," without disturbing EPA's interpretation. *Jackson v. Modly*, 949 F.3d 763, 773 (D.C. Cir. 2020). Specifically, when Congress amended Section 209(b)(1) in 1977 to

---

[15] *See, e.g.*, 44 Fed. Reg. 38,660, 38,661 (July 2, 1979); 49 Fed. Reg. 18,887, 18,890 (May 3, 1984); 51 Fed. Reg. 31,173 (Sept. 2, 1986); 52 Fed. Reg. 20,777 (June 3, 1987); 53 Fed. Reg. 7,021 (Mar. 4, 1988); 54 Fed. Reg. 6,447 (Feb. 10, 1989); 55 Fed. Reg. 43,028, 43,031 (Oct. 25, 1990); 57 Fed. Reg. 24,788, 24,789 (June 11, 1992); 58 Fed. Reg. 4,166 (Jan. 13, 1993); 59 Fed. Reg. 48,625, 48,626 (Sept. 22, 1994); 69 Fed. Reg. 60,995 (Oct. 14, 2004); 70 Fed. Reg. 50,322, 50,323 (Aug. 26, 2005); 71 Fed. Reg. at 78,192; 81 Fed. Reg. 95,982, 95,986 (Dec. 29, 2016).

expand California's discretion, it expressly approved EPA's interpretation of the provision. *See, supra,* at 9; *see also Jackson*, 949 F.3d at 773 ("indication [of congressional affirmation] is particularly strong if evidence exists of the Congress's awareness of and familiarity with [the] interpretation").

Then, in 1990, Congress further ratified EPA's "whole program" interpretation by re-enacting virtually identical text in Section 209(e)(2), which authorizes EPA to waive preemption for California emission standards for many "non-road vehicles or engines." 42 U.S.C. § 7543(e)(2)(A). Like Section 209(b)(1)(B), the second criterion for a Section 209(e)(2) waiver asks whether California needs "such California standards to meet compelling and extraordinary conditions." *Id.* § 7543(e)(2)(A)(ii). When Congress "re-enacts a statute without change," as it did here, it is "presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran* (*Curran*), 456 U.S. 353, 382 n.66 (1982).

Notably, Congress did modify the text of *other* criteria it imported from Section 209(b)(1) into Section 209(e)(2). *Compare* 42 U.S.C. § 7543(b)(1)(C), *with id.* § 7543(e)(2)(A)(iii). The decision to incorporate Section 209(b)(1)'s "need" criterion into Section 209(e)(2) without material change underscores Congress's adoption of EPA's long-standing, traditional interpretation of that criterion.

This adoption likewise shows that Congress was not concerned about what EPA describes as its "cursory" program-level review of California's need. JA__[FinalAction51345]. Indeed, there is no reason why Congress would have authorized preemption waivers for a new category of California vehicular emission standards, using virtually identical language concerning the State's "need" to reduce emissions, if Congress objected to EPA's approach or had doubts itself about California's continuing need for its own program.[16]

*Fourth*, this Court has affirmed the reasonableness of EPA's traditional "whole program" interpretation in a case involving Section 209(e)(2) and EPA's conclusion that the inquiry under Section 209(e) should be interpreted "the same as for section 209(b)." 59 Fed. Reg. 36,969, 36,982-83 (July 20, 1994); *Am. Trucking Ass'ns, Inc. v. EPA*, 600 F.3d 624, 627-28 (D.C. Cir. 2010). The agency successfully argued to this Court that the phrase "such California

[16] Even as EPA adheres to its long-standing interpretation for pollutants other than greenhouse gases, the agency argues that "such State standards" in Section 209(b)(1)(B) cannot refer to California's whole program because that phrase must have the same meaning in Section 209(b)(1)(C), under which EPA considers feasibility. JA__[FinalAction51345]. But even if adopting distinct scopes for these inquiries would require "such State standards" to have divergent meanings in different subsections, there is more than enough contextual distinction to overcome any presumption of consistent usage. *See UARG*, 573 U.S. at 320 ("a statutory term … may take on distinct characters [where Congress called] for different implementation strategies") (quotation marks omitted). For example, whereas Section 209(b)(1)(B) involves a sovereign State's need to exercise its police power, Section 209(b)(1)(C) involves narrow assessments of technological feasibility.

standards" in the second criterion under Section 209(e)(2) refers to "all California's standards that, taken as a whole, form" the State's program. Resp. Br. at 23-24, 2009 WL 2842726 (Aug. 31, 2009). This Court upheld EPA's "reasonable interpretation." *Am. Trucking*, 600 F.3d at 627.

*Finally*, EPA admits that its historical interpretation remains reasonable, omits its new individual-standard reading from its list of reasonable interpretations, and provides only circular logic for rejecting its traditional reading here. JA__[FinalAction51341]. EPA simply and baldly asserts that the "whole program" interpretation is doubtful because it would prevent EPA from reviewing individual standards. But EPA has no "mandate to assure that California's emissions control program conforms to the Administrator's perceptions of the public interest" by engaging in that type of review. *MEMA I*, 627 F.2d at 1123 n.56. EPA's failure to explain its departure from a long-standing interpretation is patently arbitrary and capricious, particularly given the substantial reliance interests at stake. *See FCC. v. Fox Television Stations, Inc.* (*Fox*), 556 U.S. 502, 515 (2009); *DHS*, -- S. Ct. --, 2020 WL 3271746, at *14.

EPA's single-standard and pollutant-specific interpretation is unlawful, and EPA erred in considering California's need for its greenhouse gas and zero-emission-vehicle standards individually, rather than the State's need for its separate motor vehicle emission program as a whole. Because EPA concedes

that California still needs its own vehicular emissions program, JA___[FinalAction51346], the agency cannot withdraw the State's waiver based on a Section 209(b)(1)(B) finding.

#### 2. California Needs Greenhouse Gas and Zero-Emission-Vehicle Standards to Reduce the Extraordinary Threats It Faces from Climate Change

EPA unlawfully interprets "extraordinary conditions" and "need" in a further attempt to bar state regulation of vehicular greenhouse gas emissions. In addition, the agency ignores the ample record demonstrating that California needs its standards to help mitigate climate change conditions that are "compelling and extraordinary" and, indeed, potentially catastrophic.

##### a. EPA's Interpretation of "Extraordinary Conditions" Is Unlawful

EPA proffers a new, rambling interpretation of "extraordinary conditions": "the particularized nexus between the emissions from California vehicles, their contribution to local pollution, and the extraordinary impacts that that pollution has on California due to California's specific characteristics." JA__[FinalAction51346]. EPA's new interpretation departs sharply and unjustifiably from both Section 209(b)(1)(B)'s text and the agency's traditional approach of looking to "factors that tend to produce higher levels of pollution" that ultimately "create serious air pollution problems." JA__[R-7839_2129].

EPA's new interpretation is defined most clearly by what it excludes: "globally elevated atmospheric concentrations of [greenhouse gases] and their environmental effects." JA__[FinalAction51349]. But, as EPA previously concluded, Congress "easily could have limited" Section 209(b)(1)(B) to particular pollutants. 49 Fed. Reg. at 18,890. Instead, it "took a broader approach" that is "consistent with its goal of allowing California to operate its own comprehensive program." *Id.* Indeed, in accordance with Congress's intent and "EPA's practice to leave the decisions on controversial matters of public policy, such as whether to regulate [certain] emissions, to California," EPA has granted at least one waiver over industry objections that the regulated pollutant was "harmless." 43 Fed. Reg. at 25,735. EPA's new interpretation directly conflicts with its past understanding, which Congress has ratified. *See, supra*, at 43-44. It also conflicts with the statutory text and structure.

Notably, Section 209(b)(1)(B) contains none of the myriad adjectives—such as "local," "particularized," "state-specific," "global," or "national"—that EPA conjures to distinguish between purportedly included and excluded pollution problems. JA__-__[FinalAction51339-40]. Other provisions of the Clean Air Act differentiate among pollutants, *e.g.*, 42 U.S.C. § 7412(b)(1), but Section 209(b)(1)(B) neither contains the word "pollutant" nor distinguishes among pollutants. Congress's choice *not* to limit Section 209(b)(1)(B) to

particular pollutants is especially telling because Congress clearly knows that air pollution is not always "state-specific" or "local." *See, e.g.*, 42 U.S.C. §§ 7402(a) (encouraging interstate cooperation regarding air pollution), 7426 (addressing interstate pollution), 7415 (addressing international pollution).[17] Section 209(b)(1)(B) is "written in starkly broad terms," and atextual limitations on types of pollution should not be read into it. *Bostock v. Clayton Cty.*, -- S. Ct. --, 2020 WL 3146686 at *17 (June 15, 2020); *see also Massachusetts*, 549 U.S. at 528-29.

EPA's attempt to exclude "global" pollution problems because they are not "specific to California" or "different from circumstances in the country at large," JA__[FinalAction51342], also creates structural conflict with Section 177. If Section 209(b) applies only to pollution problems specific to California, then Congress's decision to permit Section 177 States to adopt and enforce California's standards serves no purpose. But a "cardinal principle of statutory construction" disfavors interpretations that produce superfluous or

[17] EPA itself has acknowledged that a "local" distinction is illusory. For example, the agency recognizes that pollutants other than greenhouse gases (such as ozone and particulate matter) "can involve long range transport." JA__[R-7839_2128]; *see also* JA__-__[EPA-HQ-OAR-2018-0283-5070_101-102] (citing studies). In prior waiver proceedings, moreover, EPA concluded that "[t]here is a logical link between" reducing greenhouse gas emissions and "ground-level ozone formation" because temperature increases caused by the former contribute to the latter. JA__[FinalAction51340].

insignificant provisions. *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (quotation marks omitted).

Reading a pollutant-based limitation into Section 209(b)(1)(B) also creates structural conflict within Section 209 itself. Section 209(a) generally preempts state regulation of vehicular emissions. Section 209(b) authorizes waivers of that preemption for California standards. These two subsections are co-extensive: "[W]hatever is preempted [by Section 209(a)] is subject to waiver under subsection (b)." *MEMA I*, 627 F.2d at 1106; *see also id.* at 1107-08; 42 U.S.C. § 7543(a), (b). EPA improperly contends that California's greenhouse gas emission standards cannot be "subject to waiver" under Section 209(b), even though those standards otherwise would be subject to preemption under Section 209(a). EPA identifies no statutory support for this unintended and improper gap.

Moreover, Congress required EPA to consider California's greenhouse gas emission standard when developing federal procurement policies, 42 U.S.C. § 13212(f)(3), and to consider California's zero-emission-vehicle standard when defining "Zero Emissions Vehicle" for a federal program, 42 U.S.C. § 7586(f)(4). *See, infra,* at 94-97. Neither of these instructions makes sense if, as EPA now claims, no preemption waiver is available for those state standards.

Attempting to defend its new interpretation, EPA resorts to descriptions of "California's 'peculiar local conditions' and 'unique problems'" in the 1967 legislative history. JA__[FinalAction51342] (quoting S. Rep. No. 90-403, at 33). But those passages simply highlight that Congress did *not* codify words like "peculiar" or "unique" in Section 209(b)(1)(B). Nor does Section 209(b)(1)(B)'s language limit California to addressing the particular compelling and extraordinary conditions present at the time of its enactment. *See Bostock*, -- S. Ct. --, 2020 WL 3146686, at *16 (recognizing that "broad language" can lead to "many … applications … 'unanticipated' at the time of the law's adoption").

In fact, Congress understood, even in 1967, that "[o]ther regions of the Nation may develop air pollution situations related to automobile emissions which will require standards different from those applicable nationally." S. Rep. No. 90-403, at 33. And, ten years later, Congress recognized that those circumstances had materialized and enacted Section 177. *See* 42 U.S.C. § 7507; *see also, e.g.*, H.R. Rep. No. 95-564, at 156 (1977) (Conf. Rep.) (recognizing that other States had "automotive-related air pollution problems").[18] As EPA previously recognized, nothing "in the language of section 209 or the legislative

[18] *See also, e.g.*, 113 Cong. Rec. at 30,947 (statement of Rep. Staggers) (noting smog-related deaths in New York); *id.* at 30,955 (statement of Rep. Roybal) (noting smog-related illnesses and deaths in Pennsylvania and New York).

history [indicates] that California's pollution problem must be the worst in the country, for a waiver to be granted." 49 Fed. Reg. at 18,891.

In the end, EPA appeals to the rarely invoked constitutional doctrine of "equal sovereignty," and argues that Section 209(b)(1) provides "extraordinary treatment" to California that requires a "state-specific" and "particularized" pollution problem. JA__[FinalAction51340] n.260, __[FinalAction51347]. California is confronting such a problem with respect to greenhouse gas pollution, *see infra*, at 55-59, and continues to confront such a problem with respect to criteria pollution), *see infra*, at 59-63. But, in any event, the equal-sovereignty doctrine does not apply here.

In the limited contexts in which it has been applied, equal sovereignty requires that Congress use "current needs" to justify "current burdens" on particular States. *Shelby Cty. v. Holder*, 570 U.S. 529, 536 (2013) (quoting *Nw. Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 203 (2009)). But Section 209(b) of the Clean Air Act does not impose *any* burden on *any* State. It offers California the *choice* to implement its own vehicular emissions program, "at [its] own cost," for the benefit of the State and, ultimately, the Nation. 113 Cong. Rec. at 30,943 (statement of Rep. Holifield); *see also* S. Rep. No. 90-403, at 33 (recognizing that Californians, not the "general consumer of the Nation," pay the "increased costs associated with new control systems"). Section 177, in

turn, offers most other States the *choice* between EPA's and California's vehicular emissions program. Construing Section 209(b) to limit the types of pollutants that California may regulate, as EPA does, would diminish most States' sovereignty without enhancing the sovereignty of any State. No court has ever applied the doctrine of equal sovereignty in that perverse fashion, and this Court should not be the first.

EPA's new interpretation of "extraordinary conditions" fails.

**b. EPA's Interpretation of "Need" Is Unlawful**

EPA also reinterprets the measure of California's "need" to require a demonstration—only for standards regulating greenhouse gases—that "the State standards at issue will meaningfully redress" local problems. JA__, ___[FinalAction51345,51347]. This is another impermissible pollutant-specific interpretation that departs from EPA's historical understanding, despite Congress's adoption of that understanding. Indeed, since the earliest days of waiver proceedings, it sufficed that California standards "may result in some further reduction in air pollution in California," and it was "not legally pertinent" that the improvement might be "only marginal." 36 Fed. Reg. 17,458 (Aug. 31, 1971); *see also* 49 Fed. Reg. at 18,891. That understanding of need is consistent with EPA's long-held, correct view of Congress's intent to leave decisions about "whether to regulate" to California. 43 Fed. Reg. at 25,735.

EPA now rejects that view based solely on its erroneous and unfounded determination to interpret Section 209(b)(1)(B) to preclude California's regulation of vehicular greenhouse gas emissions. JA__[FinalAction51345] n.270.

Incremental steps to reduce vehicular greenhouse gas emissions are consequential, and regulators need not "resolve massive problems in one fell regulatory swoop." *Massachusetts*, 549 U.S. at 524. Moreover, EPA itself has found that vehicular greenhouse gas emissions in the United States cause or contribute to air pollution that endangers public health and welfare, 74 Fed. Reg. 66,496 (Dec. 15, 2009), and the agency fails to explain why California does *not* "need" to reduce the sizable contribution its vehicles make to this harmful pollution. In fact, a reduction from this highest-emitting sector "would slow the pace of global emissions increases, no matter what happens elsewhere." *Massachusetts*, 549 U.S. at 526. Congress forbade EPA from '"overturn[ing] California's judgment lightly,"' *MEMA II*, 142 F.3d at 463 (quoting H.R. Rep. No. 95-294, at 302), but that is exactly what EPA has done here by concluding that California cannot "need" standards that substantially reduce its contribution to climate change—a serious threat the State identified almost twenty years ago.

EPA's novel and strained interpretations of "extraordinary conditions" and "need" conflict with the text and structure of the Act, cannot be reconciled with the discretion Congress afforded California, and render EPA's Section 209(b)(1)(B) determination unlawful.

#### c. The Record Shows California's Need for Greenhouse Gas and Zero-Emission-Vehicle Standards to Mitigate Climate Change

EPA also ignores record evidence that conclusively shows California needs these standards to meet "compelling and extraordinary conditions"—namely, climate change impacts of greenhouse gas emissions. That showing is apparent under any understanding of "need" that is consistent with *Massachusetts* and any reasonable interpretation of "extraordinary"—which, in plain language, means "out of the ordinary." *SEC v. Gemstar-TV Guide Int'l, Inc.*, 401 F.3d 1031, 1045 (9th Cir. 2005). This remains true even under EPA's unlawful interpretation requiring "state-specific" conditions.

*First*, as documented in the 2012 waiver proceeding, California faces increasing risks from record-setting fires, deadly heat waves, destructive storm surges, sea-level rise, water supply shortages, and extreme heat, as well as threats to the State's agriculture industry and to some of the world's most ecologically diverse places. JA__-__[EPA-HQ-OAR-2012-0562-0371_7-18].

California's motor vehicles were (and are) the leading cause of greenhouse gas emissions within the State. *See* JA___[EPA-HQ-OAR-2012-0562-0011_75].

The evidence developed since the 2012 waiver proceeding confirms that California is "one of the most 'climate-challenged' regions of North America." JA___[EPA-HQ-OAR-2018-0283-5454_13]; *see also* JA___[EPA-HQ-OAR-2018-0283-5054_369] (articulating climate risks). Indeed, a November 2018 federal government study documents the impact of climate change in exacerbating California's recent record-breaking fire seasons, multi-year drought, heat waves, and flood risk, and explains the particular threat from sea-level rise and ocean acidification because California has "the most valuable ocean-based economy in the country." JA___-__[EPA-HQ-OAR-2018-0283-7447_10-13] (quoting November 2018 U.S. Global Change Research Program, "Impacts, Risks, and Adaptation in the United States: Fourth National Climate Assessment, Volume II")].[19]

---

[19] EPA committed in its Notice of Proposed Rulemaking to consider comments submitted after the close of the noticed comment period unless impracticable. JA___[ProposedAction43471]. But the agency improperly declined to include this comment in the Administrative Record, without making any finding of impracticability during the proceeding and despite NHTSA's inclusion of this material. *See* ECF No. 1832626 at 5. EPA's omission of this comment is improper, especially because EPA cited another chapter of the same federal study. *See* JA___[FinalAction51343] n.265.

These geographic, climatic, and economic factors constitute "compelling and extraordinary conditions" under any reasonable interpretation of a statute designed to give California the broadest possible discretion in reducing air pollution and its impacts. Moreover, the severity of these factors, individually and collectively, in California is "sufficiently different" from the rest of the country to constitute compelling and extraordinary conditions even under EPA's constrained interpretation of Section 209(b)(1)(B). The combination of California's wide-ranging and severe climate risks—coupled with the size and nature of its economy, the size and importance of its coastline and oceanic resources, the size and diversity of its geography, and the size of its human and motor vehicle populations—undeniably establish compelling and extraordinary conditions.

EPA may not "whistle past [the] factual graveyard," ignoring all this evidence. *Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 927 (D.C. Cir. 2017). EPA's observation that other States also have coastlines and climate impacts does not undercut the overwhelming record evidence documenting the particularly serious confluence of climate impacts affecting the natural resources and residents of California, which has the Nation's largest population and economy. JA___[FinalAction51348]. And the single study EPA cites, JA__[FinalAction51348] n.278, did not even analyze multiple climate effects

critical to California, including wildfires and droughts. EPA's dismissal of the overwhelming weight of the record renders its action arbitrary and capricious. *See Genuine Parts Co. v. EPA*, 890 F.3d 304, 346 (D.C. Cir. 2018) ("[A]n agency … may not minimize such evidence without adequate explanation.").

*Second*, EPA claims California does not "need" its greenhouse gas or zero-emission-vehicle standards because climate change impacts in the State are not caused exclusively by greenhouse gases emitted within its borders. JA___-___[FinalAction51348-49]. But even if EPA's new interpretation of "need" were reasonable, *local* carbon-dioxide concentrations can indeed result from *local* carbon-dioxide emissions and can have *local* impacts on, for instance, the degree of ocean acidification. *See* JA___[NHTSA-2018-0067-12411]; *see also, supra,* at 56 n.19.

*Third*, California needs these standards, which would result in substantial reductions of greenhouse gas emissions, even though they alone will not eliminate California's climate impacts. The Supreme Court has already recognized that incremental progress in this context is meaningful. *Massachusetts*, 549 U.S. at 524-25. Further, EPA ignores that technology-forcing standards are crucial now to facilitate greater emission reductions in the future, JA___, ___, ___-___, ___[EPA-HQ-OAR-2012-0562-0004_2,4,16-17; EPA-HQ-OAR-2018-0283-5054_373], and that incremental reductions in

greenhouse gas emissions are needed now to avoid "tipping points" beyond which climate change will accelerate abruptly and irreversibly, JA___[EPA-HQ-OAR-2018-0283-5054_370]. The Clean Air Act as a whole and Section 209(b) specifically are designed to prevent, or at least reduce, such extraordinary threats to public health and welfare.

### 3. California Needs Greenhouse Gas and Zero-Emission-Vehicle Standards to Reduce the Serious, Harmful Effects of Smog and Other Criteria Pollution

Even under EPA's strained interpretation of Section 209(b)(1)(B), its Waiver Withdrawal is unlawful because California needs its greenhouse gas and zero-emission-vehicle standards to address the very "local" conditions to which EPA attempts to limit this provision. EPA acknowledges that, despite decades of some of the strictest air pollution controls in the Nation, California continues to face the worst air quality in the country, particularly with respect to two criteria pollutants: ground-level ozone (or smog) and particulate matter. *See* JA___[FinalAction51344]; JA___-___[EPA-HQ-OAR-2018-0283-5054_365-66]. EPA concedes that these are "compelling and extraordinary conditions" for which California "need[s]" its separate vehicle emissions program, even though individual standards in isolation may only marginally improve air quality. JA___[FinalAction51346]. Even if California were required to demonstrate a need for its greenhouse gas and zero-emission-vehicle

standards—specifically, for "local" pollution problems—the State has done so, rendering the Waiver Withdrawal invalid.

As EPA has repeatedly recognized, California's greenhouse gas and zero-emission-vehicle standards each reduce criteria-pollutant emissions. Beginning in 1993, EPA has granted California multiple waivers on the ground that its zero-emission-vehicle standards reduce criteria pollution. *See supra*, at 12. Likewise, EPA has approved California's zero-emission-vehicle standard as part of several State Implementation Plans (including California's) because it helps these States attain or maintain National Ambient Air Quality Standards for criteria pollutants. JA___, ___[EPA-HQ-OAR-2018-0283-5054_372, 284]; *see also supra*, at 12 n.4. EPA has also approved multiple State Implementation Plans containing California's greenhouse gas emission standard, thereby confirming that this standard, too, reduces criteria-pollutant emissions. *See supra,* at 32 n.6. EPA has also recognized the substantial criteria-pollution benefits of *federal* vehicular greenhouse gas emission standards, and state standards produce those same benefits, albeit on smaller scales. 77 Fed. Reg. 62,624, 62,899 (Oct. 15, 2012); *see also* 83 Fed. Reg. 16,077, 16,085 (Apr. 13, 2018) ("EPA agrees that there are co-benefits from [federal greenhouse gas] standards."). EPA cannot now pretend it never reached these prior conclusions.

Moreover, California's 2012 waiver request made clear that its zero-emission-vehicle standard "remains critically important to California's efforts to meet health based air quality goals," including for criteria pollution. JA___, ___[EPA-HQ-OAR-2012-0562-0008_ES-1,72]. California explained how important this standard's technology-forcing effects are for reducing criteria pollution and meeting long-term air quality goals, JA___[EPA-HQ-OAR-2012-0562-0008_72]; JA___, ___[EPA-HQ-OAR-2012-0562-0004_2, 22]; and how the standard reduces upstream criteria-pollutant emissions from gasoline production and refining, JA___-___[EPA-HQ-OAR-2012-0562-0008_75-79]; JA___, ___[EPA-HQ-OAR-2012-0562-0004_6,16]. California quantified those latter reductions for multiple criteria pollutants, including emissions of reactive organic gas and oxides of nitrogen. JA___[EPA-HQ-OAR-2012-0562-0008_78]; JA___[EPA-HQ-OAR-2012-0562-0004_ 16].

The uncontroverted evidence before EPA underscores the point. California's zero-emission-vehicle standard "is a practical necessity to meeting the National Ambient Air Quality Standards for ozone." JA___[EPA-HQ-OAR-2018-0283-5054_308]. This standard has "led to the advancement of [zero-emission-vehicle] technology and growth in [zero-emission-vehicle] sales," and it will continue to drive the market penetration of vehicles that have lower criteria-pollutant emissions than conventional cars. JA___[EPA-HQ-

OAR-2018-0283-0016_ES-6]; *see also* JA___, __[EPA-HQ-OAR-2018-0283-2592_2;EPA-HQ-OAR-2018-0283-5054_373].

California's greenhouse gas and zero-emission-vehicle standards provide criteria-pollution benefits in other ways as well. Rising temperatures exacerbate California's ozone problem because heat and sunlight trigger production of ground-level ozone. JA___-___[EPA-HQ-OAR-2012-0562-0371_8-10]; JA___-___[EPA-HQ-OAR-2018-0283-5054_371-72] & n.901. Decreasing greenhouse gas emissions is critical to reducing temperature increases and thus to California's efforts to reduce ozone levels and meet federal air quality standards. EPA does not dispute that conclusion, contending instead that this logical link should be disregarded because it "elide[s]" EPA's manufactured distinction between "local" and other pollutants. JA____[FinalAction51340]. EPA's circular reasoning supports neither that distinction nor the agency's disregard for this well-established link.

Ignoring its own prior findings to the contrary, EPA claims, in a footnote, that California's 2012 waiver request disavowed any criteria pollution benefits from its zero-emission-vehicle standard. *See* JA___[FinalAction51349] n.284. This is simply wrong. In its waiver request, California quantified some of the criteria benefits of the zero-emission-vehicle standards. *See* JA____[EPA-HQ-OAR-2012-0562-0004_16]. And EPA itself previously found that California's

2012 waiver request "reasonably refuted" an objection that the standards produced no criteria emission benefits. JA___[R-7839_2125].

Moreover, the purported disavowal to which EPA points merely explains that, because zero-emission vehicles emit *no* pollutants, their sales also count toward automakers' compliance with California standards for emissions of greenhouse gases and criteria pollutants. *See* JA____-_____[EPA-HQ-OAR-2012-0562-0004_15-16]. Thus, these emission reductions cannot easily be allocated among the different standards that encourage those sales, and California chose to attribute the reductions to the criteria and greenhouse gas standards instead. *See* JA__[EPA-HQ-OAR-2012-0562-0004_16] ("The [zero-emission-vehicle] regulation does not provide [greenhouse gas] emission reductions … given that [zero-emission-vehicle] emissions *are included in determining compliance with the [greenhouse gas] standard*.") (emphasis added). It is preposterous to contend, as EPA now does, that a standard requiring the sale of *zero*-emission vehicles reduces no emissions, and, indeed, if that were true (as EPA asserts), California would not even need a waiver for this standard.

The record is replete with evidence of the criteria emission benefits of *both* standards at issue here. EPA cannot misrepresent and erase these benefits by selective quotation. Remarkably, EPA tries to do just that, explicitly refusing to consider evidence of criteria benefits outside of that single statement in the

waiver request. JA___[FinalAction51349] n.284. Having chosen to reconsider its 2013 decision, EPA may not ignore the record before it in 2019. *E.g.*, *Delta Air Lines, Inc. v. C.A.B.*, 561 F.2d 293, 314 & n.23 (D.C. Cir. 1977) ("Having opened the door to new data, the [agency] was obliged to take a full look."). Ignoring "evidence that undercuts [the agency's] judgment" is quintessentially arbitrary and capricious. *Genuine Parts*, 890 F.3d at 312; *Butte Cty. v. Hogen*, 613 F.3d 190, 194 (D.C. Cir. 2010). EPA cannot evade the unequivocal record evidence that greenhouse gas and zero-emission-vehicle standards reduce criteria pollution. And, under EPA's own legal theory, that fact forecloses a waiver denial (or withdrawal) under Section 209(b)(1)(B).

Furthermore, "[f]ederal agencies must act consistently with" EPA-approved State Implementation Plans "and may only engage in or approve activities that conform to [those plans]." *Cty. of Delaware v. Dep't of Transp.* (*Delaware*), 554 F.3d 143, 145 (D.C. Cir. 2009); *see also* 40 C.F.R. § 93.150. Commenters asserted that EPA's proposed invalidation of emission-reducing measures incorporated in such approved plans violates this Clean Air Act "conformity" requirement. JA___-__, ____-__[EPA-HQ-OAR-2018-0283-4124_1-3;EPA-HQ-OAR-2018-0283-5054_288-302]. Yet, EPA ignored those comments and failed to conduct even an applicability analysis, the required first

step in a conformity evaluation. *See Delaware*, 554 F.3d at 145. That error supplies yet another independent basis for vacating EPA's Waiver Withdrawal.

In sum, EPA's new determination under Section 209(b)(1)(B) contains multiple independently fatal errors and cannot support the Waiver Withdrawal.

### C. EPA's Reliance on NHTSA's Preemption Rule Is Unlawful

EPA's second basis for the Waiver Withdrawal—its reliance on NHTSA's Preemption Rule, JA__[FinalAction51338]—is wrong for two reasons.

First, NHTSA's Preemption Rule is invalid because, as shown below, NHTSA has no authority to promulgate it and the conclusions on which it is based are wrong. EPA cannot lawfully base its Waiver Withdrawal on an unlawful NHTSA regulation.[20]

Second, even assuming NHTSA's Preemption Rule were valid, EPA's reliance on the Rule—which EPA does not claim is encompassed within any of the Section 209(b)(1) factors—is still arbitrary, capricious, and contrary to law. In relying on NHTSA's regulation, EPA departs from its decades-old

[20] Because this Court lacks jurisdiction to directly review NHTSA's Preemption Rule, *see infra* at 74-78, EPA's reliance on the Rule cannot be *upheld* at this time. But, for reasons explained below, this Court need not review NHTSA's Preemption Rule in order to *reject* this ground for EPA's Waiver Withdrawal.

conclusion, affirmed by this Court, that Congress narrowly limited EPA's review of California's waiver requests to those factors enumerated in Section 209(b)(1). *See MEMA II*, 142 F.3d at 462-63 (absent an adverse finding under one of those enumerated factors, EPA is "obligated to approve California's waiver application"); *MEMA I*, 627 F.2d at 1115–20 (similar).

EPA now asserts that it can rely on factors external to Section 209(b)(1) in making a waiver decision. But the agency fails to provide the reasoned explanation required for such an abrupt reversal—especially given the substantial reliance interests engendered by EPA's grant of the waiver in 2013.

Over decades and across administrations, EPA's consistent position has been that the only bases on which it could deny California a waiver were those factors Congress enumerated in Section 209(b)(1).[21] EPA has repeatedly concluded that its evaluation of a waiver request is narrowly circumscribed by those criteria and that the Act ensures "that the waiver requests cannot be denied unless the specific findings designated in the statute can properly be made." *E.g.*, 41 Fed. Reg. 44,209, 44,210 (Oct. 7, 1976); 49 Fed. Reg. at 18,889; *cf. Ethyl Corp. v. EPA*, 51 F.3d 1053, 1061 (D.C. Cir. 1995) (provision allowing

[21] The existence of a waiver does not immunize California's standards from challenge. As both EPA and this Court recognized decades ago, "[i]f the manufacturers 'dislike the substance of the [the State's] regulations . . . then they are free to challenge the regulations in the state courts of California.'" 49 Fed. Reg. at 18,892 (quoting *MEMA I*, 627 F.2d at 1105).

EPA to waive ban on new fuel additives for additives meeting “specific and definite” criteria “does not permit the Administrator to consider other factors ‘in the public interest’”).

EPA concedes that this is how it has long understood Congress’s mandate in Section 209(b)(1). JA__[FinalAction51324, 51337]. And the agency identifies nothing in the statute that contravenes that understanding. EPA asserts only that the “context here is different” because it is “undertaking a joint action with NHTSA.” JA__[FinalAction51338]. But what Congress directed EPA to consider when it wrote Section 209(b)(1) does not change depending on whether EPA acts alone or with another agency. EPA therefore cannot reasonably reverse its interpretation on that basis.

Remarkably, EPA also admits that it “does not intend in *future* waiver proceedings … to consider factors outside the statutory criteria in [Clean Air Act] section 209(b)(1)(A)–(C).” JA__[FinalAction51338] (emphasis added). EPA’s “one-time-only” departure from its long-standing interpretation of Section 209(b)(1) lacks any reasonable explanation. *See Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016) (observing that “[u]nexplained inconsistency in agency policy is a reason for holding an interpretation to be an arbitrary and capricious change from agency practice”) (internal quotation marks omitted). And the perfunctory explanation EPA did provide for its

results-oriented, one-time-only approach certainly does not amount to the "more detailed justification" required when, as here, reliance interests are involved. *See, supra*, at 29-32. *See also Fox*, 556 U.S. at 515-16; *DHS*, -- S. Ct. --, 2020 WL 3271746, at *14.

## II. EPA's Section 177 Determination Is Unlawful

Section 177 of the Clean Air Act authorizes qualifying States to "adopt and enforce" vehicular emission standards "identical to the California standards for which a waiver has been granted" if they provide two years' lead time. 42 U.S.C. § 7507. Twelve States have adopted California greenhouse gas emission standards to protect their residents from the impacts of climate change and criteria pollutant emissions. Yet, EPA has now finalized a novel determination that Section 177 "does not apply to [California greenhouse gas emission] standards"—even if EPA has granted California a waiver for those standards. JA___[FinalAction51350].[22] This determination, like EPA's Waiver Withdrawal, exceeds EPA's authority and misconstrues the statute.

[22] EPA's Section 177 Determination does not extend to California's zero-emission-vehicle standards, *see* JA___[FinalAction51350]; indeed, EPA failed to respond to comments highlighting the absence of those standards from its proposed determination, *see* JA___[EPA-HQ-OAR-2018-0283-5481_130_n.353].

### A. EPA's Section 177 Determination Exceeds Its Authority

Section 177 gives EPA no role in determining whether qualifying States may adopt California emission standards. Rather, it confers directly and exclusively upon those States the discretion to "adopt and enforce" California standards for which a waiver has been granted, subject only to the requirements of identicality and lead time. 42 U.S.C. § 7507.

EPA now asserts authority to decide which California emission standards other States may adopt, solely because it is "the agency charged with implementing the Clean Air Act." JA__[FinalAction51351]. The Act, however, charges EPA only with implementing its assigned "functions." 42 U.S.C. § 7601; *see Gonzales v. Oregon*, 546 U.S. 243, 258-59 (2006) (distinguishing agency authority to carry out its "functions" from broader authority to carry out statute's "provisions"). EPA's "single, narrow" function under Section 177 is to define when a model year commences for purposes of measuring lead time. *Motor Vehicle Mfrs. Ass'n v. NYSDEC*, 17 F.3d 521, 535 (2d Cir. 1994). The Act does not authorize EPA to "conduct a separate waiver proceeding for each state" that adopts California standards. *Ford Motor Co.*, 606 F.2d at 1298. In fact, "States are not required to seek EPA approval under the terms of section 177" at all. 77 Fed. Reg. 62,624, 62,637 n.54 (Oct. 15, 2012). Rather, the decision to "adopt and enforce the California option" was "left up to the

State." 123 Cong. Rec. 16,674, 16,675 (1977) (statement of Rep. Rogers); *see* 42 U.S.C. § 7507.

### B. EPA's Interpretation Is Contrary to the Relevant Statutory Provisions

Even if EPA had authority to issue the Section 177 Determination, it misconstrues the provision's scope. Section 177 is co-extensive with—and applies to the same emission standards as—Section 209(b)(1). Under Section 177, States may adopt and enforce standards "identical to the California standards for which a [Section 209(b)(1)] waiver has been granted," 42 U.S.C. § 7507(1), and, in describing that set of standards, Congress used essentially "the same words" as in Section 209(b)(1), *NYSDEC*, 17 F.3d at 532. *Compare* 42 U.S.C. § 7543(a), (b)(1) (describing standards for "control of emissions from new motor vehicles or new motor vehicle engines"), *with id.* § 7507 (same). Because both provisions describe state authority to adopt vehicular emission standards, the context does not suggest a different scope. *See Util. Air Regulatory Grp. v. EPA* (*UARG*), 573 U.S. 302, 319-20 (2014). Thus, under Section 177's plain text, States may adopt and enforce standards for which California has a waiver, regardless of the pollutants controlled by those standards.

Nor does EPA explain how its selective approach—wherein States may adopt *some*, but not all, of California's light-duty vehicular emission standards—

is consistent with Section 177's express prohibition against creating a "third vehicle." 42 U.S.C. § 7507. Commenters raised the possibility of a "third vehicle" resulting from EPA's interpretation, under which conventional vehicles sold in Section 177 States would have to comply with a mixture of the federal standards for greenhouse gases and California standards for other pollutants. *See, e.g.*, JA___, __-__, __-__[EPA-HQ-OAR-2018-0283-5481_134; EPA-HQ-OAR-2018-0283-5070_155;EPA-HQ-OAR-2018-0283-4163_13-14]. EPA never responded to these comments and thus "entirely failed to consider an important aspect of the problem." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.* (*State Farm*), 463 U.S. 29, 43 (1983).

Attempting to defend its interpretation, EPA relies primarily on Section 177's requirement that qualifying States have "plan provisions approved" to limit criteria pollutants under subchapter 1, part D of the Act. 42 U.S.C. § 7507; *see, e.g.*, 42 U.S.C. §§ 7502, 7505a, 7511c. But this requirement constrains only which *States* can make use of Section 177; it does not restrict which California *standards* those States can adopt. The presence of other express limitations on States' authority (the identicality and lead time requirements) further indicates that Congress did not limit the types of "standards" or pollutants covered by Section 177. *Cf. Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644,

661-64 (2007) (rejecting attempt to "engraft[]"additional criterion into statutory provision).

EPA is wrong to suggest that the provision's "title," which refers to areas in "nonattainment" with National Ambient Air Quality Standards, or its "placement" in subchapter I of the Act somehow narrow the emission standards covered by Section 177's plain text. JA__-__[FinalAction51350-51]; *see Whitman*, 531 U.S. at 483 (title "may only she[d] light on some ambiguous word or phrase in the statute itself" (quoting *Carter v. United States*, 530 U.S. 255, 267 (2000)); *Nat'l Ctr. for Mfg. Sci. v. Dep't of Def.*, 199 F.3d 507, 511 (D.C. Cir. 2000) (similar, regarding "placement"). Indeed, the substantially identical Section 209(e) provision—authorizing States' adoption of California non-road vehicle and engine standards—lacks such a title and is placed in subchapter II. *See* 42 U.S.C. § 7543(e)(2)(B). There is no reason to suppose Congress intended to authorize other States to adopt *any* California standards for non-road vehicles, but only *criteria* standards for on-road vehicles.[23]

[23] EPA points to legislative history for a since-superseded version of Section 172, 42 U.S.C. § 7502, which concerns State Implementation Plans for areas that have not attained federal air quality standards. JA__[FinalAction51350] n.286. At most, that history establishes that Congress intended States to consider vehicular emissions when developing plans for these areas. *Id.* Nothing in that history suggests Congress intended to *constrain* States from regulating emissions of particular pollutants.

Finally, even assuming Section 177 were limited to facilitating States' efforts to reduce criteria pollutants, that still would not justify EPA's Section 177 Determination. As already shown, EPA has recognized that greenhouse gas emission standards reduce criteria pollutants. *See supra*, 60-62. Indeed, EPA has approved the inclusion of these very greenhouse gas emission standards in several State Implementation Plans. *See supra*, at 32 n.6. EPA acknowledges these prior approvals, *see* JA__[FinalAction51338] n.256, but refuses to grapple with the implications its new interpretation of Section 177 will have on those plans and States' significant reliance on them. That failure independently renders the Section 177 Determination arbitrary and capricious. *See DHS*, -- S. Ct. --, 2020 WL 3271746, at *14; *Encino Motorcars*, 136 S. Ct. at 2126.

## III. THIS COURT SHOULD VACATE NHTSA'S PREEMPTION RULE IF IT HAS JURISDICTION TO DIRECTLY REVIEW IT

Because no statute confers jurisdiction on the courts of appeals to review NHTSA's Preemption Rule directly, the protective petitions for its review should be dismissed for lack of jurisdiction. If this Court determines that it has jurisdiction, there are three independent reasons to vacate NHTSA's Preemption Rule. First, Congress has not authorized the agency to issue regulations regarding preemption under EPCA's fuel-economy chapter. Next, NHTSA is wrong to conclude that EPCA preempts state greenhouse gas and zero-emission-vehicle standards for which EPA has granted California a Clean

Air Act waiver. Finally, NHTSA violated the National Environmental Policy Act by issuing the Preemption Rule without considering its substantial environmental impacts.

### A. NHTSA's Preemption Rule Must Be Reviewed First by the District Court Because This Court Lacks Jurisdiction

"[P]ersons seeking review of agency action [must] go first to district court rather than to a court of appeals" unless "a direct-review statute specifically gives the court of appeals subject-matter jurisdiction to directly review agency action." *Pub. Citizen, Inc. v. NHTSA*, 489 F.3d 1279, 1287 (D.C. Cir. 2007) (quotation marks omitted). Petitioners sought review of NHTSA's Preemption Rule in the district court first because no statute authorizes this Court to directly review it. *See California v. Chao* (*Chao*), D.D.C. Case No. 1:19-cv-02826-KBJ (filed Sept. 20, 2019). Because NHTSA took the opposite view on jurisdiction, however, JA__[FinalAction51361], parties "quite appropriately" filed petitions in this Court "as a 'protective measure,' to ensure compliance with the relevant jurisdictional deadlines in the event that" jurisdiction lies here, *Nat'l Auto. Dealers Ass'n v. FTC*, 670 F.3d 268, 270-72 (D.C. Cir. 2012). This Court denied petitioners' motions to hold these cases in abeyance pending the district court's review and instead ordered the parties to brief "all the issues," including jurisdiction, in this Court. ECF No. 1826992. The district court then

stayed proceedings pending this Court's review. *Chao*, Minute Order (Feb. 11, 2020).

NHTSA's Preemption Rule must be reviewed by the district court in the first instance. This Court has jurisdiction to directly review EPA's Waiver Withdrawal and Section 177 Determination, which are "action[s] of the [EPA] Administrator" under the Clean Air Act. 42 U.S.C. § 7607(b)(1). But the Clean Air Act does not confer pendent jurisdiction over NHTSA's concurrently published action. *See Pub. Citizen*, 489 F.3d at 1288 (refusing "to disregard plain statutory terms" authorizing direct review of only one of two "closely related" agency actions).

Nor does EPCA give this Court original jurisdiction to review NHTSA's rule. EPCA's direct-review provision applies only to "regulation[s] prescribed in carrying out any of sections 32901-32904 or 32908," or "prescribed under section 32912(c)(1)," of Title 49. 49 U.S.C. § 32909(a). That list does not include EPCA's preemption section, *id.* § 32919, or the section that generally authorizes the Secretary of Transportation (and her delegate, NHTSA) to "prescribe regulations to carry out [her] duties and powers," *id.* § 322(a).

NHTSA cites Sections 32901-32903 as authority for the Preemption Rule. JA__[FinalAction51320]. But, as the Supreme Court held in *National Association of Manufacturers v. Department of Defense* (*NAM*), an agency cannot vault its rule

into the original jurisdiction of the courts of appeals by mere "invocation" of authority under a statutory section. 138 S. Ct. 617, 630 n.8 (2018). And none of the three sections invoked by NHTSA even hints at authorizing regulations declaring the scope of EPCA preemption.

Rather, those sections authorize highly specific regulations that address only certain elements of NHTSA's responsibilities with respect to the federal fuel-economy program. Section 32901 authorizes NHTSA to issue regulations refining particular statutory definitions and setting minimum driving ranges for certain vehicles for purposes of the federal fuel-economy program. 49 U.S.C. § 32901(a)(1), (a)(10), (a)(14), (a)(15), (a)(18), (b), (c). Section 32902 authorizes the agency to prescribe federal fuel-economy standards by regulation. *Id.* § 32902(a)-(d), (g), (k). Section 32903 authorizes NHTSA to create programs for trading or transferring credits automakers earn for exceeding those fuel-economy standards. *Id.* § 32903(f), (g).

Moreover, Congress requires NHTSA to "consult with the Secretary of Energy in carrying out [section 32902] and section 32903." 49 U.S.C. § 32902(i). But no such consultation occurred with regard to the Preemption Rule, and NHTSA has asserted that none was required. Def.'s Reply in Support of Mot. to Dismiss or Transfer, *Chao*, Dkt. 44, at 12 n.9 (Dec. 3, 2019). That

alone shows the Preemption Rule does not "carry[] out" either Section 32902 or 32903. 49 U.S.C. § 32909(a)(1).

NHTSA argues that its Preemption Rule is "necessary to the effectiveness of" the fuel-economy standards that NHTSA prescribes in carrying out Section 32902. JA__[FinalAction51316]. That is not the case. *See infra* at 79. Even if it were, NHTSA's "necessary to the effectiveness" test is no more grounded in statutory text than the "'practical-effects' test" rejected in *NAM,* and it similarly "renders other statutory language superfluous." 138 S. Ct. at 630. In EPCA's direct-review provision, Congress expressly included certain rules necessary to the effectiveness of federal fuel-economy standards, *e.g.*, 49 U.S.C. § 32903(f) (rules for credit trading), while excluding others, *e.g.*, *id.* § 32907(b) (rules for fuel-economy reporting and recordkeeping). This Court is "required to give effect to Congress' express inclusions and exclusions, not disregard them." *NAM*, 138 S. Ct. at 631.

The direct-review provision at issue in *NAM*, 33 U.S.C. § 1369(b)(1)(E), authorizes review of regulations prescribed "under"—rather than "in carrying out"—various statutory sections, but that difference in phrasing does not result in a substantive difference in meaning. EPCA's statutory history confirms that its direct-review provision similarly applies only to rules prescribed "under"—i.e., "'pursuant to' or 'by reason of the authority of,'" *NAM*, 138 S. Ct. at 630—

the specified statutory sections. Indeed, EPCA originally limited direct review to regulations "prescribed under" the specified sections. 15 U.S.C. § 2004(a) (1976). Congress amended the direct-review provision to substitute "prescribed in carrying out" for "prescribed under" in 1994, as part of a general consolidation and recodification of transportation statutes. Pub. L. No. 103-272 (Title 49 Consolidation), § 1(e), 108 Stat. 745, 1070. But that substitution "may not be construed as making a substantive change in the law," *id.* § 6(a), 108 Stat. at 1378, and thus did not "expand the scope of the pre-existing jurisdiction of the courts of appeals," *Tidewater Oil Co. v. United States*, 409 U.S. 151, 162 (1972) (interpreting another general consolidation statute not to reallocate federal jurisdiction).

Because this Court cannot directly review NHTSA's Preemption Rule, it must dismiss the protective petitions for review of that rule and await any appeal of the district court proceeding in which the rule has been challenged. *See, e.g.*, *Delta Constr. Co. v. EPA*, 783 F.3d 1291, 1298-99 (D.C. Cir. 2015) (dismissing petition for review of action not covered by terms of EPCA's direct-review provision).

### B. NHTSA Lacks Authority to Pronounce Upon Preemption

If this Court has jurisdiction, it should vacate NHTSA's Preemption Rule because it exceeds the agency's authority. "Agencies may act only when and

how Congress lets them." *Cent. United Life Ins. Co. v. Burwell*, 827 F.3d 70, 73 (D.C. Cir. 2016). They cannot "pronounce on pre-emption absent delegation by Congress." *Wyeth v. Levine*, 555 U.S. 555, 577 (2009). No provision of EPCA's fuel-economy chapter delegates such a power to NHTSA.

NHTSA exercises "the authority vested in the Secretary under" EPCA's fuel-economy chapter. 49 C.F.R. § 1.95(a). But Congress vested in the Secretary only the authority to "prescribe regulations to carry out the duties and powers" that chapter assigns her. 49 U.S.C. § 322(a). That limited delegation does not authorize NHTSA to issue regulations regarding EPCA's preemption of state and local laws, precisely because the agency lacks "duties and powers" as to preemption. *See Gonzales*, 546 U.S. at 258-65.

Preemption under EPCA's fuel-economy chapter is, as NHTSA concedes, "self-executing." JA__[FinalAction51325]. That is because the text of EPCA's preemption clause, Section 32919, itself bars States and localities from adopting or enforcing certain measures when a federal fuel-economy standard is in effect. 49 U.S.C. § 32919(a). No agency action is necessary (or authorized) to implement this provision, as "the territory exclusively occupied by federal law [i]s defined in the text of the statute itself." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 489 n.9 (1996) (plurality opinion).

Section 32919 does not mention the Secretary, let alone assign her duties or powers. Congress knows how to authorize the Secretary to carry out a preemption clause. *See, e.g.*, 49 U.S.C. §§ 5125, 31141. And, within EPCA, Congress authorized a different agency—the Federal Energy Administration, a predecessor to the Department of Energy—to "prescribe … rule[s]" that preempt state and local appliance-efficiency standards. EPCA, § 327(b), 89 Stat. at 927, *recodified as amended at* 42 U.S.C. § 6297(d). Congress's omission of a comparable delegation in Section 32919 is compelling evidence that NHTSA lacks duties or powers, and thus cannot issue regulations, respecting express preemption. *See Rotkiske v. Klemm*, 140 S. Ct. 355, 361 (2019).

The same holds true for conflict preemption. If Congress had wanted to imbue NHTSA's views on conflict preemption with the force of law, Congress would have said so. *See Wyeth*, 555 U.S. at 576-77 & n.9. Instead, EPCA gives no hint of authorizing NHTSA to determine the implied preemptive effect of federal fuel-economy standards. And, because conflict preemption is "incapable of resolution in the abstract, let alone in gross," *Mozilla Corp. v. FCC*, 940 F.3d 1, 81 (D.C. Cir. 2019) (quotation marks omitted), NHTSA cannot declare a host of state and local measures preempted "independent" of "any particular" fuel-economy standard or its relationship to a particular state or local law, JA__[FinalAction51320]. *Cf.* EPCA, § 327(b), 89 Stat. at 927

(directing Federal Energy Administration to adjudicate case-by-case whether particular state and federal energy-conservation standards conflict); 49 U.S.C. § 5125(d) (similar delegation for Secretary of Transportation); *id.* § 31141(c)(4)(B) (same). Nor can NHTSA declare the same group of measures forever "related to" federal law based solely on an analysis of current automotive technologies. *See infra*, at 100-102.

NHTSA's invocation of *Chevron* deference, JA__[FinalAction51320] & n.118, adds nothing. "*Chevron* is a rule of statutory construction," *Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 920 F.3d 1, 27 (D.C. Cir. 2019), sometimes used to resolve "ambiguity in a statute meant for implementation by an agency," *Smiley v. Citibank (South Dakota)*, 517 U.S. 735, 740-41 (1996). It "is not a magic wand that invests agencies with regulatory power beyond what their authorizing statutes provide." *Mozilla*, 940 F.3d at 84. Because no statute gives NHTSA the "*authority*" to pronounce upon preemption, it is irrelevant whether the agency may have the "*ability* to make informed determinations" on the subject. *Wyeth*, 555 U.S. at 577 (emphases added).

NHTSA claims that allowing States to "regulate in this area" "frustrate[s]" NHTSA's "statutory role." JA__[FinalAction51313]. But the Supremacy Clause gives precedence to "the *Laws* of the United States," U.S. Const. art. VI, cl. 2 (emphasis added), not the "priorities or preferences of federal officers," *Kansas*

*v. Garcia*, 140 S. Ct. 791, 807 (2020). NHTSA cannot declare even "inconsistent state regulation" preempted "just because it frustrates" NHTSA's preferred means of implementing the statute. *Mozilla*, 940 F.3d at 80 (quotation marks omitted). Accordingly, the Preemption Rule must be vacated because it is not "tether[ed] … to a relevant source of statutory authority." *Id.*

### C. NHTSA Errs in Construing EPCA to Expressly Preempt Greenhouse Gas and Zero-Emission-Vehicle Standards for Which EPA Has Granted a Section 209(b) Waiver

NHTSA is also wrong about EPCA's preemptive effect. The Preemption Rule, which is not entitled to any deference, erroneously interprets the statute to preempt California greenhouse gas and zero-emission-vehicle standards. But Congress has taken great pains to preserve state emission standards in multiple statutes, including in the express language of EPCA itself. NHTSA's attempts to overcome that clear legislative intent fall flat.

#### 1. NHTSA's Preemption Determinations Must Be Reviewed De Novo

NHTSA asserts "expert authority to interpret and apply the requirements of EPCA, including preemption," and pleads for "deference" to its reading of the statute. JA__[FinalAction51320]. Even if NHTSA were authorized to issue preemption regulations, however, this Court must review de novo the agency's preemption determinations.

As the Supreme Court explained in *Wyeth v. Levine*, judicial deference to an agency's "conclusion that state law is pre-empted" is improper unless Congress has delegated to the agency authority "to pre-empt state law *directly*." 555 U.S. at 576 (emphasis altered). NHTSA never claims to have *that* authority. Whether to defer to an agency's preemption determination absent such a delegation "is an open question in this circuit" after *Wyeth*, *Delaware v. STB*, 859 F.3d 16, 20-21 (D.C. Cir. 2017), but six other circuits have correctly answered in the negative.[24]

It would be especially inappropriate to defer to NHTSA's conclusion in the Preemption Rule that EPCA preempts certain state emission standards preserved by the Clean Air Act. As explained further below, evaluating that conclusion requires "reconciliation of distinct statutory regimes," EPCA and the Clean Air Act, the latter of which NHTSA lacks "particular interest in or expertise with." *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1629 (2018) (quotation marks omitted). This Court accordingly must "exercise independent interpretive judgment," rather than deferring to NHTSA's attempt to

[24] *See Capron v. Office of Atty. Gen.*, 944 F.3d 9, 40 (1st Cir. 2019); *Lusnak v. Bank of Am., N.A.*, 883 F.3d 1185, 1192-93 (9th Cir. 2018); *Sikkelee v. Precision Airmotive Corp.*, 822 F.3d 680, 693-94 (3d Cir. 2016); *Seminole Tribe v. Stranburg*, 799 F.3d 1324, 1338 (11th Cir. 2015); *Steel Inst. v. City of New York*, 716 F.3d 31, 40 (2d Cir. 2013); *Franks Inv. Co. v. Union Pac. R.R. Co.*, 593 F.3d 404, 413-14 (5th Cir. 2010).

aggrandize its statutory role by "diminish[ing]" the Clean Air Act's "scope in favor of a more expansive interpretation of" EPCA. *Id.*

In addition, deference is unwarranted because NHTSA "wrongly believes that [its statutory] interpretation is compelled by Congress." *PDK Labs. Inc. v. DEA*, 362 F.3d 786, 798 (D.C. Cir. 2004) (quotation marks omitted). NHTSA claims that its preemption determinations follow from the "plain text of EPCA's express preemption provision," not an exercise of interpretive discretion. JA__[FinalAction51322]; *see also* JA__[ProposedAction43234]. In fact, the agency relied on a disavowal of interpretive discretion as its reason for not complying with the National Environmental Policy Act and other laws before issuing the Preemption Rule. JA__-__[FinalAction51354-60]; *see also infra*, at 108-109. As NHTSA did not exercise interpretive discretion, the Preemption Rule must be set aside unless it codifies the *only* reasonable interpretation of EPCA. *See PDK*, 362 F.3d at 797-98. It does not.

#### 2. EPCA Does Not Preempt State Emission Standards for Which EPA Has Granted a Section 209(b) Waiver

The Preemption Rule declares that, even if EPA has waived preemption for California's greenhouse gas and zero-emission-vehicle standards under Section 209(b) of the Clean Air Act, EPCA nonetheless bars California and other States from adopting or enforcing those standards.

Decades of congressional enactments say otherwise. Years before EPCA, Congress enacted Section 209(b) of the Clean Air Act for the sole purpose of preserving California's ability to regulate vehicular emissions. In 1975, Congress enacted EPCA and, far from preempting California's vehicular emission standards, prioritized those standards by requiring NHTSA to consider them when prescribing and adjusting fuel-economy standards. In 1990, implicitly recognizing California's authority to establish zero-emission-vehicle standards under Section 209(b), Congress amended the Clean Air Act to require EPA to use those standards to develop emission limits for certain private fleets. And, in 2007, following a robust debate regarding California's authority to set greenhouse gas emission standards, Congress enacted EISA, which not only includes a broad savings clause but also expressly ties federal procurement policy for low greenhouse-gas emitting vehicles to whichever of EPA's or California's standards is most stringent. This history unequivocally shows "Congress understood" that California's standards for greenhouse gas emissions and zero-emission vehicles "survive." *N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.* (*Travelers*), 514 U.S. 645, 656 (1995).

Against this clear evidence of legislative intent, NHTSA proffers a myopic and ahistorical construction of EPCA's preemption clause. The clause displaces a state or local "law or regulation related to fuel economy standards or average

fuel economy standards for automobiles covered by [a federal] average fuel-economy standard" then "in effect." 49 U.S.C. § 32919(a); *see* JA__[FinalAction51315]. Although a preemption provision's use of the phrase "related to" "expresses a broad pre-emptive purpose," *Coventry Health Care of Mo. v. Nevils*, 137 S. Ct. 1190, 1197 (2017) (quotation marks omitted), that phrase is "indeterminate," *Mellouli v. Lynch*, 135 S. Ct. 1980, 1990 (2015), "amorphous," and "quite ambiguous," *United States v. Hubbell*, 167 F.3d 552, 559-60 (D.C. Cir. 1999). If read literally, this preemption clause "would never run its course," *Gobeille v. Liberty Mut. Ins. Co.*, 136 S. Ct. 936, 943 (2016), because "relations ... stop nowhere," *Maracich v. Spears*, 570 U.S. 48, 59 (2013) (quotation marks omitted).

This Court's interpretive task, therefore, is to identify a pertinent "limiting principle" for EPCA's preemptive scope "consistent with the structure of the statute and its other provisions." *Maracich*, 570 U.S. at 59-60 (quotation marks omitted). EPCA's preemption clause does not purport to displace state laws merely because they have the effect of promoting or impeding fuel economy—as do a wide array of state laws, from speed limits to pollution-control regulations. The clause applies only to state laws "related to fuel economy standards." Whatever the outer contours of that phrase, Congress manifestly did not preempt emission standards applicable by reason of Section 209(b) of

the Clean Air Act. Congress made that clear upon EPCA's enactment and later affirmed its application to greenhouse gas and zero-emission-vehicle standards in particular. NHTSA's reasons for declaring these state emission standards preempted are arbitrary, capricious, and contrary to law.

#### a. EPCA recognized and prioritized state emission standards over federal fuel-economy objectives

Before enacting EPCA in 1975, Congress had codified, in the Clean Air Act's preemption and waiver provisions, a policy that new motor vehicles would be subject to two, and only two, sets of emission standards: EPA's and California's. Pursuant to an EPA waiver, California already was regulating several pollutants emitted by passenger cars and light trucks.[25] 40 Fed. Reg. 23,102 (May 28, 1975). Automakers told both EPA and Congress that "compliance with the California standards could be accomplished only by paying penalties in the form of increased costs, restricted model lines, *poorer fuel economy*, and reduced driveability" of new vehicles. *Id.* at 23,104 (emphasis added); *see also* H.R. Rep. 94-340, at 87. Rather than preempting California emission standards, Congress responded to automakers' concerns by ensuring

[25] Light trucks are designed for off-highway operation and are larger than passenger cars. 49 U.S.C. § 32901(a)(18). EPCA defines light trucks as "non-passenger automobiles." *Id.* § 32901(a)(17); *see also* 15 U.S.C. § 2001(3) (1976).

that the fuel-economy effects of California emission standards were accounted for in determining automakers' federal fuel-economy standards under EPCA.

Congress itself set a minimum average fuel-economy level for passenger-car manufacturers for the first three model years of the program, 1978-80. 15 U.S.C. § 2002(a)(1) (1976). But individual manufacturers could petition NHTSA to relax the fuel-economy standard Congress set. *See id.* § 2002(d). NHTSA had to grant such a petition if, *inter alia*, compliance with new or different "Federal standards" reduced an automaker's average fuel economy. *Id.* § 2002(d)(3)(C)(i).

Congress defined "Federal standards" to include both EPA's "emissions standards under section 202 of the Clean Air Act" *and* California's "emissions standards applicable by reason of section 209(b) of such Act." 15 U.S.C. § 2002(d)(3)(D)(i) (1976). Congress thereby signaled that EPCA did not preempt California emission standards for which EPA granted a waiver, even if they substantially affected fleet-average fuel economy. In the event of a conflict, automakers could obtain relief not from state emission standards but from the federal fuel-economy standard. Were EPCA to simultaneously preempt California's emission standards and require NHTSA to consider them, it would produce an unreasonable "'statutory contradiction' (really, self-contradiction)." *Mozilla*, 940 F.3d at 37; *see also Green Mountain*, 508 F. Supp. 2d at 354.

This time-limited "Federal standards" adjustment provision informs the permanent meaning of EPCA's preemption clause, because "meaning is fixed at the time of enactment." *Wisc. Cent. Ltd. v. United States*, 138 S. Ct. 2067, 2074 (2018) (emphasis omitted). At the time of enactment, Congress plainly thought that EPCA's preemption of state laws "relating to fuel economy standards," 15 U.S.C. § 2009(a) (1976), preserved the "category of … emissions standards applicable by reason of section 209(b) of [the Clean Air] Act," *id.* § 2002(d)(3)(D). Put another way, "the scope of the state law that Congress understood would survive," *Gobeille*, 136 S. Ct. at 943 (quotation marks omitted), included state "standard[s] relating to the control of emissions," 42 U.S.C. § 7543(a).

NHTSA claims that Congress accommodated state emission standards in this fashion only for certain model years and only for certain vehicle types. NHTSA observes that Congress defined "Federal standards" only "[f]or the purposes of th[e] subsection" allowing NHTSA to adjust congressionally prescribed fuel-economy standards for model year 1978-80 passenger cars. 15 U.S.C. § 2002(d)(3) (1976); *see* JA__[ProposedAction43237]. But that misses the point. Congress did not define California emission standards as "Federal standards" for the purely theoretical purpose of calculating potential fuel-economy adjustments; it did so with the expectation that compliance with

California emission standards might reduce fuel economy. Such reductions would have been impossible if Congress were concurrently declaring those same emission standards void and unenforceable.[26]

In any event, EPCA accommodated California emission standards by means other than the time-limited "Federal standards" provision. The statute further required NHTSA to consider fuel-economy effects of "Federal motor vehicle standards" whenever it prescribed fuel-economy standards or modified an automaker's compliance obligation for any vehicle type (e.g., passenger cars or light trucks) and for any model year. 15 U.S.C. § 2002(e) (1976), *recodified as amended at* 49 U.S.C. § 32902(f). That requirement continues to the present day, following a non-substantive amendment substituting the phrase "motor vehicle standards of the Government" for "Federal motor vehicle standards." Title 49 Consolidation, §§ 1(e), 6(a), 108 Stat. at 1060, 1378.

---

[26] Historical context confirms that the "Federal standards" provision has broader implications for the scope of EPCA preemption than the subsection in which the provision appears. At the time EPCA was enacted, EPA had waived preemption of California emission standards for passenger cars of model years 1975 and later, and those standards plateaued beginning in model year 1977. 13 Cal. Admin. Code § 1955.1 (1975); *see also* 40 Fed. Reg. 23,102. EPCA provided for NHTSA to adjust federal fuel-economy standards to account for the effects of California emission standards on fuel economy for model years 1978-80. But the same California emission standards would apply to model years 1981 and thereafter, and there is no reason to believe Congress intended to prioritize these state laws for several years, only to subject them to preemption thereafter.

Congress did not expressly define "Federal motor vehicle standards," but it means the same thing as "Federal standards." These terms are identical save for two words ("motor vehicle") that do not actually differentiate them, because "Federal standards" themselves must be "applicable to" motor vehicles. 15 U.S.C. § 2002(d)(3)(C)(i) (1976). Moreover, NHTSA does not articulate any reason why Congress would have recognized and prioritized California emission standards over federal fuel-economy goals, but only for model year 1978-80 passenger cars. In fact, the Preemption Rule "flouts" four decades of NHTSA's "consistent … understanding," *Fin. Planning Ass'n v. SEC*, 482 F.3d 481, 490 (D.C. Cir. 2007), that California emission standards are "Federal motor vehicle standards."[27]

NHTSA's new, narrow construction of "Federal motor vehicle standards" that excludes California emission standards is implausible; indeed, it would have had bizarre results in EPCA's early years. For instance, omitting California emission standards from "Federal motor vehicle standards" would have

[27] *See, e.g.*, 43 Fed. Reg. 11,995, 12,009-10 (Mar. 23, 1978); 53 Fed. Reg. 11,074, 11,077-78 (Apr. 5, 1988); 56 Fed. Reg. 13,773, 13,777-79 (Apr. 4, 1991); 68 Fed. Reg. 16,868, 16,893-96 (Apr. 7, 2003); 71 Fed. Reg. 17,566, 17,639-43 (Apr. 6, 2006). NHTSA is wrong to suggest that the Preemption Rule codifies a "longstanding position on EPCA preemption." JA__[FinalAction51312]. The agency has never before premised final action on the view that EPCA displaces state emission standards that the Clean Air Act preserves.

prejudiced small automakers to whom Congress extended special solicitude. As noted above, EPCA allowed any passenger-car manufacturer to petition NHTSA to adjust fuel-economy standards for model years 1978-80 if "Federal standards" reduced that manufacturer's fleet-average fuel economy. But Congress anticipated that this limited adjustment might not suffice for small manufacturers. EPCA authorized those manufacturers to ask NHTSA to set "alternative average fuel economy standards" from scratch after considering "Federal motor vehicle standards." 15 U.S.C. § 2002(c), (e) (1976). Had "Federal motor vehicle standards" excluded California emission standards, much of the benefit of this small-automaker exemption would have been lost, because NHTSA could not have accounted for the fuel-economy penalty that California emission standards then imposed on automakers. NHTSA sensibly interpreted "Federal motor vehicle standards" to include California emission standards. *See, e.g.*, 46 Fed. Reg. 5,022, 5,024-25 (Jan. 19, 1981) (proposed rule finalized at 46 Fed. Reg. 24,952 (May 4, 1981)).

Excluding California emission standards from the definition of "Federal motor vehicle standards" also would mean that Congress took polar opposite approaches to California emission standards for different vehicles (cars versus trucks) of the same model years (1978-80), with no apparent rationale. Whereas Congress itself prescribed a minimum average fuel-economy level for passenger

cars of those model years, 15 U.S.C. § 2002(a)(1) (1976), Congress directed NHTSA to set those standards for light trucks after considering "Federal motor vehicle standards," *id.* § 2002(b), (e). In other words, Congress instructed NHTSA to account for "Federal standards" when adjusting fuel-economy standards for passenger cars and for "Federal motor vehicle standards" when setting fuel-economy standards for light trucks. NHTSA sensibly accounted for California standards in both cases. *See, e.g.*, 42 Fed. Reg. 13,807, 13,814-15 (Mar. 14, 1977).

Because emission standards applicable by reason of Section 209(b) of the Clean Air Act *were* "Federal motor vehicle standards"—and *are* "motor vehicle standards of the Government"—NHTSA must consider those state standards before setting federal fuel-economy standards. Again, a statutory contradiction would result if EPCA preempted the same state emission standards it directed NHTSA to consider when prescribing federal fuel-economy standards.

In sum, the Preemption Rule wrongly declares preempted the very state emission standards that EPCA requires NHTSA to consider when implementing the statute. Its rule is invalid as applied to any state emission standard for which EPA has granted a Clean Air Act waiver to California.

### b. The 1990 Clean Air Act Amendments recognized that state zero-emission-vehicle standards survived EPCA

The 1990 Clean Air Act Amendments expressly recognized California's authority to establish zero-emission-vehicle standards for which EPA grants a Section 209(b) waiver. At that time, California had developed a zero-emission-vehicle standard and was preparing to seek a waiver from EPA. *See supra*, at 12. The State's nascent zero-emission-vehicle standard featured in Congress's new "clean fuel vehicles" program in the 1990 Amendments. Under that program, EPA must promulgate eligibility criteria for "Zero Emissions Vehicles" in a manner that "conform[s] as closely as possible to standards which are established by the State of California" for those vehicles. 42 U.S.C. § 7586(f)(4); *see* 40 C.F.R. § 88.104-94(g), (k)(2) (adopting California's criteria wholesale). Congress's instruction to follow California's lead would have meant nothing if, as NHTSA now declares, EPCA prohibited California from establishing zero-emission-vehicle standards in the first place.

### c. EISA recognized that state greenhouse gas emission standards survived EPCA

In 2007, EISA laid to rest any doubt about California's authority to set its own greenhouse gas emission standards by ratifying that authority—which two district courts had recently upheld—and expressly recognizing the prospect of concurrent state and federal regulation of vehicular greenhouse gas emissions.

EISA comprehensively amended EPCA to reinvigorate NHTSA's stalled fuel-economy program. *See supra*, at 17. Congress enacted EISA at the end of 2007, following three pertinent court decisions earlier that year. In April, the Supreme Court had affirmed EPA's authority under Section 202 of the Clean Air Act to regulate vehicular greenhouse gas emissions and rejected the claim that EPCA's fuel-economy program displaced that authority. *Massachusetts*, 549 U.S. at 528-29, 531-32. Then, in September and early December, district courts in Vermont and California rejected claims that EPCA preempts greenhouse gas emission standards for which EPA has granted California a Section 209(b) waiver. *Green Mountain*, 508 F. Supp. 2d at 354, 398; *Central Valley*, 529 F. Supp. 2d at 1175, 1179.

Congress rejected a string of proposals to overturn those court decisions, either by giving NHTSA authority to regulate greenhouse gases or by divesting EPA and California of that authority. Those proposals included an amendment demanded by the Bush Administration under threat of a presidential veto. *See* JA__-__[EPA-HQ-OAR-2018-0283-4132_AppxA_13-15]. EISA passed without any such amendment and with a savings clause stating that "[e]xcept to the extent expressly provided," EISA did not "supersede[], limit[] the authority provided or responsibility conferred by, or authorize[] any violation of any provision of law (including a regulation), including any energy or environmental

law or regulation." 42 U.S.C. §17002; *see also* JA__-__[EPA-HQ-OAR-2018-0283-4132_AppxA_3-17].

This legislative history reveals Congress's understanding that California's power to regulate vehicular greenhouse gas emissions had survived EPCA. That understanding formed "part of the contemporary legal context in which Congress legislated," and "the fact that a comprehensive reexamination and significant amendment" of EPCA made no change to its preemptive scope "is itself evidence that Congress affirmatively intended to preserve" the status quo. *Curran*, 456 U.S. at 381-82 (quotation marks omitted).

Indeed, Congress unambiguously recognized California's greenhouse gas emission standards in Section 141 of EISA, Pub. L. No. 110-140, 121 Stat. at 1518, *codified at* 42 U.S.C. § 13212(f). Section 141 instructs EPA (not NHTSA) to identify models of "low greenhouse gas emitting vehicles" to prioritize for federal procurement after "tak[ing] into account the *most stringent* standards for vehicle greenhouse gas emissions applicable to and enforceable against motor vehicle manufacturers for vehicles sold anywhere in the United States." 42 U.S.C. § 13212(f)(2)(A), (3)(B) (emphasis added). This reference to the "most stringent" greenhouse gas emission standards would be meaningless if only EPA could prescribe such standards. In fact, "the only applicable greenhouse gas emissions standards" in 2007 were "those adopted by California and

[Section 177] states." H.R. Rep. No. 110-297, pt. 1, at 17 (2007). Congress could not plausibly have intended a reference to the "most stringent" greenhouse gas emission standards to exclude the only standards then applicable. And Congress plainly would not have referred to the standards as "enforceable" for purposes of Section 141 if EPCA preempted them. Section 141 of EISA is accordingly "incompatible with pre-emption" of EPA-approved state greenhouse gas emission standards. *Travelers*, 514 U.S. at 667.

NHTSA has no plausible response. Though it does not administer Section 141, the agency claims "standards for vehicle greenhouse gas emissions" really means "requirements for fuel economy," i.e., requirements that States and municipalities may impose "for automobiles obtained for [their] own use." 49 U.S.C. § 32919(c); *see* JA__[FinalAction51322]. NHTSA speculates that these fuel-economy "requirements" might be "enforceable against motor vehicle manufacturers," 42 U.S.C. § 13212(f)(3)(B), on a "fleet average" basis, *id.* § 13212(f)(3)(C), via "contractual procurement relationships," JA__[FinalAction51322]. In other words, NHTSA would have EPA survey all state and municipal (and potentially even corporate) fleet-acquisition policies addressing fuel economy, identify the subset of policies then "enforceable" through binding contracts with automakers, and link federal procurement rules to the most stringent policy among that ever-changing subset. Unsurprisingly,

EPA has not adopted that clumsy and unworkable reading of Section 141. *See* EPA, "Guidance for Implementing Section 141 of the Energy Independence and Security Act of 2007," Doc. EPA-420-B-19-049, at 4-5 (Sept. 19, 2019), https://nepis.epa.gov/Exe/ZyPDF.cgi?Dockey=P100XI43.pdf (last visited June 26, 2020).

NHTSA argues that the "equal sovereignty" doctrine favors its strained reading of Section 141 because that doctrine limits the breadth of California's authority to establish vehicular emission standards where other States cannot. JA__[FinalAction51322]. But California's authority to do so is preserved by the Clean Air Act, not EISA, and the equal-sovereignty doctrine does not prohibit recognition of that authority, nor support an interpretation of the Clean Air Act that preempts California's greenhouse gas emission standards. *See supra*, at 52-53.

**d. NHTSA does not offer any persuasive reason to interpret EPCA to preempt state greenhouse gas and zero-emission-vehicle standards**

NHTSA's other arguments for why EPCA preempts state greenhouse gas and zero-emission-vehicle standards are likewise unavailing. First, there is not a "necessary and inevitable" relationship between greenhouse gas emission standards and fuel economy, let alone fuel-economy *standards*. Second, NHTSA's justifications for the Preemption Rule do not apply to state zero-

emission-vehicle standards. Third, second-order effects of greenhouse gas and zero-emission-vehicle standards on automakers' strategies to comply with federal fuel-economy standards do not trigger preemption under EPCA.

#### (1) There is no "necessary and inevitable" relationship between state greenhouse gas emission standards and federal fuel-economy standards

NHTSA errs on law and fact when it contends that EPCA permanently preempts state greenhouse gas emission standards because of a claimed "necessary and inevitable," "mathematically measurable" relationship between fuel economy and the measurement of tailpipe carbon-dioxide emissions. JA__[FinalAction51313].[28] First, the relationship of a state law to *fuel economy* does not establish a relationship to fuel-economy *standards* that would trigger preemption under EPCA.

---

[28] NHTSA cites as proof Congress's endorsement of EPA's 1975 carbon-dioxide emissions test procedures for gasoline and diesel vehicles as "sufficient to measure fuel economy performance." JA__[ProposedAction43234] (citing 49 U.S.C. § 32904(c)). But that glosses over several ways in which compliance measurements for current fuel-economy and emission standards are not premised on tailpipe carbon-dioxide emissions. *See, e.g.*, 85 Fed. Reg. at 24,221, 25,207-08 (describing NHTSA and EPA credits for "off-cycle" technologies not captured in tailpipe tests; EPA credits for refrigerant leakage reductions and replacement with less potent greenhouse gases; and EPA credits for electric, hydrogen, plug-in hybrid, and natural gas vehicles due to their long-term "emissions benefits").

Second, NHTSA's claim depends on an incomplete description of vehicular pollution-control technologies that also disregards how those technologies are evolving. It is arbitrary and capricious for NHTSA to codify a declaration of preemption based on an incomplete and transitory overlap between vehicular pollution-control and energy-conservation technologies.

*Most* technologies automakers *currently* use to comply with greenhouse gas emission standards improve fuel economy and reduce tailpipe carbon-dioxide emissions. But there are significant exceptions. An automaker's decision to replace potent greenhouse gases used as air conditioner refrigerants does not affect tailpipe emissions or fuel economy; indeed, NHTSA admits that EPCA does not preempt state emission standards addressing refrigerant leakage and replacement. JA__[FinalAction51314]. Automakers also can produce zero-emission vehicles, which, as discussed below, involve no tailpipe emissions; have a "fuel economy" divorced from emissions and gasoline consumption; and cannot be considered in setting federal fuel-economy standards. These technologies have no "necessary and inevitable" relationship with federal fuel-economy standards.

NHTSA argues that even if States may regulate air conditioner refrigerants and require deployment of zero-emission vehicles, they nonetheless cannot set greenhouse gas emission standards. NHTSA appears to contend that

if *some* of the technologies currently being deployed to comply with state greenhouse gas emission standards also improve fuel economy, then the state standards must be "related to" federal fuel-economy standards and preempted. But NHTSA's preemption determination—at least for state laws addressing anything beyond air conditioner refrigerants—is permanent, while the relative contribution of a particular technology to reducing vehicular greenhouse gas emissions waxes and wanes over time.

A decade ago, automakers could comply with state greenhouse gas emission standards in substantial part by preventing leakage of air conditioner refrigerants. *See Green Mountain*, 508 F. Supp. 2d at 381. Now, the California Air Resources Board's technical experts anticipate that the availability of zero-emission vehicles will increasingly influence the stringency of future greenhouse gas emission standards. JA__[EPA-HQ-OAR-2018-0283-0016_ES34]. Other technology under early development would reduce or eliminate tailpipe carbon-dioxide emissions without improving fuel economy. *See* JA__[NHTSA-2018-0067-12000_166] (describing automaker investments in on-board vehicle technologies to capture and store carbon-dioxide).

The incomplete and transient nature of the overlap between technologies to comply with greenhouse gas emission standards and technologies to comply with fuel-economy standards is fatal to NHTSA's Preemption Rule, because it

shows that no state greenhouse gas emission standard is "inherently related" to fuel economy, much less to fuel-economy standards. JA__[FinalAction51326]. NHTSA cannot premise a permanent declaration of preemption on a shifting and impermanent overlap in compliance technologies.

#### (2) The Preemption Rule's justifications do not apply to zero-emission-vehicle standards

Zero-emission-vehicle standards have been an integral part of California's air-quality planning since the State first adopted them in 1990 to reduce emissions of criteria pollutants. EPCA does not preempt them.

As just discussed, the asserted "foundation" of the Preemption Rule is a purportedly "mathematical" relationship between "[a]utomobile fuel economy" and "emissions of carbon dioxide." JA__, __[FinalAction51315, 51328]. But there is no such relationship for zero-emission vehicles. "'[F]uel economy' means the average number of miles traveled by an automobile for each gallon of gasoline (or equivalent amount of other fuel) used." 49 U.S.C. § 32901(a)(11). The zero-emission vehicles currently on the market are fueled by electricity or hydrogen, and, under EPCA, there is no "mathematical" relationship between consumption of those fuels and carbon-dioxide emissions. *See id.* § 32904(a)(2)(B) (requiring Secretary of Energy to consider four qualitative and quantitative factors when determining what amount of electricity is equivalent to a gallon of gasoline); *id.* § 32905(c) (granting NHTSA

discretion to decide what volume of hydrogen is equivalent to a gallon of gasoline); *see also* 61 Fed. Reg. 14,507, 14,511-12 (Apr. 2, 1996) (NHTSA assigning hydrogen a gasoline-equivalent value independent of carbon-dioxide emissions). NHTSA's asserted basis for preempting zero-emission-vehicle standards is thus arbitrary, capricious, and contrary to law.

The time and manner in which Congress added zero-emission vehicles to EPCA's fuel-economy program further undermine NHTSA's position that the statute preempts zero-emission-vehicle standards. EPCA displaces only "law[s] or regulation[s] … for automobiles." 49 U.S.C. § 32919(a). Between 1975 and 1992, EPCA could not have preempted state laws applicable only to zero-emission vehicles because it did not define them as "automobile[s]." 15 U.S.C. § 2001(1) (1976). When Congress amended that definition to add zero-emission vehicles in 1992, it did so to "build on," not preempt, state standards promoting them. H.R. Rep. No. 102-474, pt. 1, at 137 (1992). The Energy Policy Act, Pub. L. No. 102-486, 106 Stat. 2776 (1992), brought these vehicles within the definition of "automobiles" to reward automakers for producing them with credits usable toward compliance with federal fuel-economy standards. *See* 49 U.S.C. § 32904(a). The House Report accompanying that Act lauded Section 177 States' "decision to opt in to" California's vehicular emissions program, H.R. Rep. No. 102-474, pt. 1, at 137, and it singled out the

nascent zero-emission-vehicle standard for praise, *id.*, pt. 2, at 87, 90-92. It is not reasonable to suppose that Congress intended to preempt that standard—or any future zero-emission-vehicle standard California might adopt—by redefining zero-emission vehicles as "automobiles."[29]

Even as Congress appended zero-emission vehicles to EPCA's definition of "automobile," the Energy Policy Act prohibited NHTSA from "considering the[ir] fuel economy" when setting federal fuel-economy standards. 49 U.S.C. § 32902(h)(1); *see also id.* § 32901(a)(1), (8). That prohibition ensures that policies promoting zero-emission vehicles do not affect federal fuel-economy *standards* at all, let alone "directly and substantially." JA____ [FinalAction51314]. When issuing the Preemption Rule, NHTSA ignored public comments highlighting this statutory prohibition and thus "entirely failed to consider [this] important aspect of the problem" before the agency.

[29] NHTSA's disregard of the statutory language limiting preemption under EPCA to those laws applicable to covered automobiles has other impermissible implications. For example, it leads NHTSA to suggest that EPCA's preemptive reach extends beyond the manufacture or sale of new vehicles to displace state and local "in use" vehicle regulations. JA__[FinalAction51318] & n.96. EPCA, which regulates only vehicle *manufacturers*, cannot immunize vehicle *owners* from any constraint related to fuel-economy standards. NHTSA's sweeping view of EPCA preemption undoes the agency's assurance that States and municipalities may promote zero-emission vehicles "in many different ways, such as through … appropriately tailored incentives" like discounts on tolls or access to restricted lanes. JA__[FinalAction51321].

*State Farm*, 463 U.S. at 43; *see also* JA__-__, ___[NHTSA-2018-0067-11873_406-07,NHTSA-2018-0067-12000_162].

**(3) Emission standards' effect on automakers' strategy to comply with fuel-economy standards does not trigger preemption**

NHTSA argues that the second-order effect of greenhouse gas and zero-emission-vehicle standards on automakers' "strategy to comply with" federal fuel-economy standards triggers preemption under EPCA. JA__[FinalAction51320]. That is wrong.

To the extent state greenhouse gas and zero-emission-vehicle standards prompt individual manufacturers to improve their fleet-average fuel economy, those emission standards further, rather than frustrate, EPCA's dominant aim of petroleum conservation. That effect does not trigger preemption because the statute provides only for "a minimum level of average fuel economy applicable to a manufacturer in a model year." 49 U.S.C. § 32901(a)(6). Automakers are not penalized for exceeding that federal minimum. Rather, they *benefit* by accruing compliance "credits" they can spend to attain compliance in other model years or trade to other manufacturers for cash. *Id.* § 32903.

Emission standards that improve fuel economy are nothing new. Shortly before EPCA was enacted, California's standards had improved fuel economy by forcing adoption of catalytic-converter technology. *See* H.R. Rep. No. 94-

340, at 86-87 (citing significant fuel-economy improvement between model years 1974 and 1975). Two years later, legislators recognized emission standards' potential to spur adoption of other technologies that significantly improve fuel economy. H.R. Rep. No. 95-294, at 242, 247 (1977). Had Congress wanted to preempt state emission standards for that reason, it would have said so. But the Clean Air Act Amendments of 1977 broadened state authority without even hinting at the sea change in preemption NHTSA now claims occurred in 1975. *See* 42 U.S.C. § 7507 (authorizing other States to adopt standards identical to California's); *id.* § 7543(b)(3) (amendment providing that "compliance with such State standards shall be treated as compliance with applicable Federal standards for [Clean Air Act] purposes"). "Congress' silence on the pre-emption of state [laws] that Congress previously sought to foster counsels against pre-emption" of those laws. *Cal. Div. of Labor Stds. Enforcement v. Dillingham Constr.*, 519 U.S. 316, 331 n.7 (1997). Indeed, it would turn preemption doctrine on its head to hold that EPCA accommodates state laws that impair energy conservation but displaces state laws that further it.[30]

[30] It is of no moment that Congress did not have state greenhouse gas or zero-emission-vehicle standards before it when enacting EPCA. "While every statute's *meaning* is fixed at the time of enactment, new *applications* may arise in light of changes in the world." *Wisc. Cent.*, 138 S. Ct. at 2074; *see also Bostock*, 2020 WL 3146686 at *15-*17. EPCA does not preempt *any* emission standard applicable by reason of Section 209(b) of the Clean Air Act, whatever the

The second-order effect of emission standards on automakers' "strategy to comply with" federal fuel-economy standards does not trigger preemption. JA__[FinalAction51320]. "[M]yriad state laws in areas traditionally subject to local regulation"—such as workplace-safety laws, minimum-wage requirements, and incentives like rebates for certain vehicles—likewise impact automakers' compliance strategies. *Travelers*, 514 U.S. at 668. But "Congress could not possibly have intended" that a federal fuel-economy program displace all those laws. *Id.* State greenhouse gas and zero-emission-vehicle standards are not expressly preempted by EPCA.

### D. NHTSA Errs in Interpreting EPCA to Impliedly Preempt Greenhouse Gas and Zero-Emission-Vehicle Standards

The Preemption Rule's pronouncements on implied preemption are also unlawful. To begin with, NHTSA "has not concluded that implied preemption broadens the scope of preemption established by Congress" in EPCA's express preemption clause. JA__[FinalAction51318]. Indeed, the agency maintains that "conflict principles of implied preemption do not apply in fields where Congress has enacted an express preemption provision." JA__

---

direction or magnitude of its effect on fuel economy. *Cf. Int'l Union v. NLRB*, 675 F.2d 1257, 1259-62 (D.C. Cir. 1982) (declining to hold state law preempted due to change in circumstances after enactment of federal statute).

[ProposedAction43236]; *see also* JA__[FinalAction51312] ("fully reaffirm[ing]" that view).

In any event, the Preemption Rule falls short of the "high threshold [that] must be met if a state law is to be [conflict] preempted." *Chamber of Commerce v. Whiting*, 563 U.S. 582, 607 (2011) (plurality opinion) (quotation marks omitted). For the reasons stated above in connection with express preemption, the rule does not show that any, much less all, state greenhouse gas or zero-emission-vehicle standards "stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives of" EPCA. *Sickle v. Torres Adv. Enter. Solutions, LLC*, 884 F.3d 338, 347 (D.C. Cir. 2018); *see also Mozilla*, 940 F.3d at 81 (explaining that conflict preemption is "incapable of resolution in the abstract, let alone in gross").

### E. NHTSA Violated the National Environmental Policy Act

Finally, the Preemption Rule must be set aside because NHTSA issued it "without observance of procedure required by" the National Environmental Policy Act. 5 U.S.C. § 706(2)(D). That statute requires federal agencies to prepare an environmental impact statement or environmental assessment for actions, including the "interpret[ations]" of federal statutes, 40 C.F.R. § 1508.18(b)(1), that significantly affect the quality of the human environment, 42 U.S.C. § 4332(2)(C). NHTSA's decision to issue a regulation that is

"inconsistent" with state emission standards and will "directly or indirectly" increase air pollution is a quintessentially discretionary action requiring this environmental review.[31] *See* 49 C.F.R. §§ 520.4(b)(3), 520.5(b)(6)(i), (b)(8), (b)(9).

NHTSA asserts that the National Environmental Policy Act does not apply to the Preemption Rule because the agency "lacks discretion over EPCA's preemptive effect." JA___[FinalAction51354]. *But see* JA__[FinalAction51320] & n.118 (NHTSA requesting *Chevron* deference). If any ambiguity exists in EPCA, NHTSA's statutory interpretation would axiomatically reflect an exercise of discretion and thus require compliance with the National Environmental Policy Act. But even if ambiguity did not exist, NHTSA "cannot ... seriously argue that [it] did not have control over the issuance of its own Rule" declaring long-standing state emission standards preempted. *Humane Soc. of U.S. v. Johanns*, 520 F. Supp. 2d 8, 20-21 (D.D.C. 2007). NHTSA's failure to comply with the National Environmental Policy Act provides an additional basis for vacatur of the Preemption Rule. *See Am. Bird Conservancy, Inc. v. FCC,* 516 F.3d 1027, 1034-35 (D.C. Cir. 2008).

[31] *See* JA___-__[NHTSA-2017-0069-0497_2-3] (discussing increase in air pollution and NHTSA's failure to analyze action alternatives); *see also* JA___-__[NHTSA-2017-0069-0608_ADD1-2]; JA___-__[NHTSA-2017-0069-0499__3-4].

## CONCLUSION

At every turn in their quest to eliminate state authority to set greenhouse gas and zero-emission-vehicle standards, EPA and NHTSA reached beyond their own authorities, casually set aside decades-long interpretations and practices approved by courts, disregarded statutory text and history that clearly establish congressional intent, ignored the record, and flouted core procedural requirements of administrative law.

This Court should vacate EPA's Waiver Withdrawal and Section 177 Determination. The Court should dismiss the protective petitions challenging NHTSA's action for lack of jurisdiction or, in the alternative, vacate that action.

Dated: June 26, 2020

Respectfully submitted,

*For Petitioners in Cases No. 19-1230, 19-1243, 20-1178:*


/s/ Matthew Littleton
MATTHEW LITTLETON
SEAN H. DONAHUE
Donahue, Goldberg, Weaver & Littleton
1008 Pennsylvania Avenue SE
Washington, DC 20003
(202) 683-6895
matt@donahuegoldberg.com

VICKIE L. PATTON
PETER M. ZALZAL
ALICE HENDERSON
Environmental Defense Fund
2060 Broadway, Suite 300
Boulder, CO 80302
(303) 447-7215
vpatton@edf.org

*Counsel for Environmental Defense Fund*


*For Petitioners in Cases No. 19-1239, 19-1246:*

FOR THE STATE OF CALIFORNIA


XAVIER BECERRA
Attorney General of California
ROBERT BYRNE
EDWARD H. OCHOA
Senior Assistant Attorneys General
GARY E. TAVETIAN
DAVID A. ZONANA
Supervising Deputy Attorneys General
JESSICA BARCLAY-STROBEL
JULIA K. FORGIE
MEREDITH J. HANKINS
KAVITA LESSER
CAROLYN NELSON ROWAN
TIMOTHY E. SULLIVAN
JONATHAN A. WIENER
Deputy Attorneys General

/s/ M. Elaine Meckenstock
M. ELAINE MECKENSTOCK
Deputy Attorney General
1515 Clay Street, 20th Floor
Oakland, CA 94612-0550
Telephone: (510) 879-0299
Elaine.Meckenstock@doj.ca.gov

*Attorneys for Petitioner State of California, by and through its Governor Gavin Newsom, Attorney General Xavier Becerra, and California Air Resources Board*


*Additional Counsel on Following Pages*

*Additional Counsel in Cases No. 19-1239, 19-1246:*


FOR THE STATE OF COLORADO

PHIL WEISER
Colorado Attorney General

*<u>/s/ Eric R. Olson</u>*
ERIC R. OLSON
Solicitor General
Office of the Attorney General
1300 Broadway, 10th Floor
Denver, CO 80203
Telephone: (720) 508-6548
eric.olson@coag.gov

*Attorneys for Petitioner State of Colorado*

FOR THE STATE OF CONNECTICUT

WILLIAM TONG
Attorney General of Connecticut
MATTHEW I. LEVINE
Assistant Attorney General

*<u>/s/ Scott N. Koschwitz</u>*
SCOTT N. KOSCHWITZ
Assistant Attorney General
165 Capitol Avenue
Hartford, CT 06106
Telephone: (860) 808-5250
Fax: (860) 808-5386
Scott.Koschwitz@ct.gov

*Attorneys for Petitioner State of Connecticut*

FOR THE STATE OF DELAWARE

KATHLEEN JENNINGS
Attorney General of the State of Delaware

*<u>/s/ Kayli H. Spialter</u>*
KAYLI H. SPIALTER
CHRISTIAN WRIGHT
Deputy Attorneys General
Delaware Department of Justice
820 N. French Street, 6th Floor
Wilmington, DE 19801
Telephone: (302) 395-2604
Kayli.spialter@delaware.gov

*Attorneys for Petitioner State of Delaware*

FOR THE DISTRICT OF COLUMBIA

KARL A. RACINE
Attorney General for the District of Columbia

*<u>/s/ Loren L. AliKhan</u>*
LOREN L. ALIKHAN
Solicitor General
Office of the Attorney General for the District of Columbia
One Judiciary Square
441 4th Street, NW, Suite 630 South
Washington, D.C. 20001
Telephone: (202) 727-6287
Fax: (202) 730-1864
Loren.AliKhan@dc.gov

*Attorneys for Petitioner District of Columbia*

FOR THE STATE OF HAWAII

CLARE E. CONNORS
Attorney General

_/s/ William F. Cooper_
WILLIAM F. COOPER
Deputy Attorney General
State of Hawaii Office of the Attorney General
425 Queen Street
Honolulu, HI 96813
Telephone: (808) 586-4070
Bill.F.Cooper@Hawaii.gov

*Attorneys for Petitioner State of Hawaii*

FOR THE STATE OF ILLINOIS

KWAME RAOUL
Attorney General of Illinois
MATTHEW J. DUNN
Chief, Environmental Enforcement/
Asbestos Litigation Division
JASON E. JAMES
Assistant Attorney General

_/s/ Daniel I. Rottenberg_
DANIEL I. ROTTENBERG
Assistant Attorney General
69 W. Washington St., 18th Floor
Chicago, IL 60602
Telephone: (312) 814-3816
DRottenberg@atg.state.il.us

*Attorneys for Petitioner State of Illinois*

FOR THE STATE OF MAINE

AARON M. FREY
Attorney General of Maine

<u>*/s/ Laura E. Jensen*</u>
LAURA E. JENSEN
Assistant Attorney General
6 State House Station
Augusta, ME 04333
Telephone: (207) 626-8868
Fax: (207) 626-8812
Laura.Jensen@maine.gov

*Attorneys for Petitioner State of Maine*

FOR THE STATE OF MARYLAND

BRIAN E. FROSH
Attorney General of Maryland

<u>*/s/ Cynthia M. Weisz*</u>
CYNTHIA M. WEISZ
Assistant Attorney General
Office of the Attorney General
Maryland Department of the Environment
1800 Washington Blvd.
Baltimore, MD 21230
Telephone: (410) 537-3014
cynthia.weisz2@maryland.gov

JOHN B. HOWARD, JR.
JOSHUA M. SEGAL
STEVEN J. GOLDSTEIN
Special Assistant Attorneys General
Office of the Attorney General
200 St. Paul Place
Baltimore, MD 21202
Telephone: (410) 576-6300
jsegal@oag.state.md.us

*Attorneys for Petitioner State of Maryland*

FOR THE COMMONWEALTH OF MASSACHUSETTS

MAURA HEALEY
Attorney General
CHRISTOPHE COURCHESNE
Assistant Attorney General
Chief, Environmental Protection Division
CAROL IANCU
Assistant Attorney General
MEGAN M. HERZOG
DAVID S. FRANKEL
Special Assistant Attorneys General

*/s/ Matthew Ireland*
MATTHEW IRELAND
Assistant Attorney General
Office of the Attorney General
Environmental Protection Division
One Ashburton Place, 18th Floor
Boston, MA 02108
Telephone: (617) 727-2200
matthew.ireland@mass.gov

*Attorneys for Petitioner Commonwealth of Massachusetts*

FOR THE PEOPLE OF THE STATE OF MICHIGAN

DANA NESSEL
Attorney General of Michigan

*/s/ Neil D. Gordon*
NEIL D. GORDON
GILLIAN E. WENER
Assistant Attorneys General
Michigan Department of Attorney General
Environment, Natural Resources and Agriculture Division
P.O. Box 30755
Lansing, MI 48909
Telephone: (517) 335-7664
gordonn1@michigan.gov

*Attorneys for Petitioner People of the State of Michigan*

FOR THE STATE OF MINNESOTA

KEITH ELLISON
Attorney General of Minnesota

<u>*/s/ Peter N. Surdo*</u>
PETER N. SURDO
Special Assistant Attorney General
445 Minnesota Street, Suite 900
St. Paul, MN, 55101
Telephone: (651) 757-1061
Peter.Surdo@ag.state.mn.us

*Attorneys for Petitioner State of Minnesota*

FOR THE STATE OF NEVADA

AARON D. FORD
Attorney General of Nevada

<u>*/s/ Heidi Parry Stern*</u>
HEIDI PARRY STERN
Solicitor General
DANIEL P. NUBEL
Deputy Attorney General
Office of the Nevada Attorney General
100 N. Carson Street
Carson City, NV 89701
HStern@ag.nv.gov

*Attorneys for Petitioner State of Nevada*

FOR THE STATE OF NEW JERSEY

GURBIR S. GREWAL
Attorney General of New Jersey

<u>*/s/ Lisa Morelli*</u>
LISA MORELLI
Deputy Attorney General
25 Market St., PO Box 093
Trenton, NJ 08625-0093
Telephone: (609) 376-2745
Fax: (609) 341-5031
Lisa.morelli@law.njoag.gov

*Attorneys for Petitioner State of New Jersey*

FOR THE STATE OF NEW MEXICO

HECTOR BALDERAS
Attorney General of New Mexico

<u>*/s/ William Grantham*</u>
WILLIAM GRANTHAM
Assistant Attorney General
State of New Mexico Office of the
Attorney General
Consumer & Environmental Protection
Division
201 Third Street NW, Suite 300
Albuquerque, NM 87102
Telephone: (505) 717-3520
wgrantham@nmag.gov

*Attorneys for Petitioner State of New Mexico*

FOR THE STATE OF NEW YORK

LETITIA JAMES
Attorney General of New York
YUEH-RU CHU
Chief, Affirmative Litigation Section
Environmental Protection Bureau
AUSTIN THOMPSON
Assistant Attorney General

*<u>/s/ Gavin G. McCabe</u>*
GAVIN G. MCCABE
Assistant Attorney General
28 Liberty Street, 19th Floor
New York, NY 10005
Telephone: (212) 416-8469
gavin.mccabe@ag.ny.gov

*Attorneys for Petitioner State of New York*

FOR THE STATE OF NORTH CAROLINA

JOSHUA H. STEIN
Attorney General
DANIEL S. HIRSCHMAN
Senior Deputy Attorney General
FRANCISCO BENZONI
Special Deputy Attorney General

*<u>/s/ Asher P. Spiller</u>*
ASHER P. SPILLER
TAYLOR CRABTREE
Assistant Attorneys General
North Carolina Department of Justice
P.O. Box 629
Raleigh, NC 27602
Telephone: (919) 716-6400

*Attorneys for Petitioner State of North Carolina*

FOR THE STATE OF OREGON

ELLEN F. ROSENBLUM
Attorney General of Oregon

/s/ Paul Garrahan
PAUL GARRAHAN
Attorney-in-Charge
STEVE NOVICK
Special Assistant Attorney General
Natural Resources Section
Oregon Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
Telephone: (503) 947-4593
Paul.Garrahan@doj.state.or.us
Steve.Novick@doj.state.or.us

*Attorneys for Petitioner State of Oregon*

FOR THE COMMONWEALTH OF PENNSYLVANIA

JOSH SHAPIRO
Attorney General of Pennsylvania
MICHAEL J. FISCHER
Chief Deputy Attorney General
JACOB B. BOYER
Deputy Attorney General

/s/ Ann R. Johnston
ANN R. JOHNSTON
Senior Deputy Attorney General
Office of Attorney General
1600 Arch St. Suite 300
Philadelphia, PA 19103
Telephone: (215) 560-2171
ajohnston@attorneygeneral.gov

*Attorneys for Petitioner Commonwealth of Pennsylvania*

FOR THE STATE OF RHODE ISLAND

PETER F. NERONHA
Attorney General of Rhode Island

/s/ Gregory S. Schultz
GREGORY S. SCHULTZ
Special Assistant Attorney General
Office of Attorney General
150 South Main Street
Providence, RI 02903
Telephone: (401) 274-4400
gschultz@riag.ri.gov

*Attorneys for Petitioner State of Rhode Island*

FOR THE STATE OF VERMONT

THOMAS J. DONOVAN, JR.
Attorney General

/s/ Nicholas F. Persampieri
NICHOLAS F. PERSAMPIERI
Assistant Attorney General
Office of the Attorney General
109 State Street
Montpelier, VT 05609
Telephone: (802) 828-3171
nick.persampieri@vermont.gov

*Attorneys for Petitioner State of Vermont*

FOR THE COMMONWEALTH OF VIRGINIA

MARK R. HERRING
Attorney General
PAUL KUGELMAN, JR.
Senior Assistant Attorney General
Chief, Environmental Section

*/s/ Caitlin C. G. O'Dwyer*
CAITLIN C. G. O'DWYER
Assistant Attorney General
Office of the Attorney General
Commonwealth of Virginia
202 North 9th Street
Richmond, VA 23219
Telephone: (804) 786-1780
godwyer@oag.state.va.us

*Attorneys for Petitioner Commonwealth of Virginia*

FOR THE STATE OF WASHINGTON

ROBERT W. FERGUSON
Attorney General

*/s/ Emily C. Nelson*
EMILY C. NELSON
Assistant Attorney General
Office of the Attorney General
P.O. Box 40117
Olympia, WA 98504
Telephone: (360) 586-4607
emily.nelson@atg.wa.gov

*Attorneys for Petitioner State of Washington*

FOR THE STATE OF WISCONSIN

JOSHUA L. KAUL
Attorney General of Wisconsin

*/s/ Gabe Johnson-Karp*
GABE JOHNSON-KARP
JENNIFER L. VANDERMEUSE
Assistant Attorneys General
Wisconsin Department of Justice
Post Office Box 7857
Madison, WI 53702-7857
Telephone: (608) 267-8904
Fax: (608) 294-2907
johnsonkarpg@doj.state.wi.us

*Attorneys for Petitioner State of Wisconsin*

FOR THE CITY OF LOS ANGELES

MICHAEL N. FEUER
Los Angeles City Attorney
MICHAEL J. BOSTROM
Assistant City Attorney

*/s/ Michael J. Bostrom*
MICHAEL J. BOSTROM
Assistant City Attorney
200 N. Spring Street, 14th Floor
Los Angeles, CA 90012
Telephone: (213) 978-1867
Fax: (213) 978-2286
Michael.Bostrom@lacity.org

*Attorneys for Petitioner City of Los Angeles*

FOR THE CITY OF NEW YORK

JAMES E. JOHNSON
New York City Corporation Counsel
ROBERT L. MARTIN
Senior Counsel
SHIVA PRAKASH
Assistant Corporation Counsel

/s/ Christopher G. King
CHRISTOPHER G. KING
Senior Counsel
New York City Law Department
100 Church Street
New York, New York
Telephone: (212) 356-2074
Fax: (212) 356-2084
cking@law.nyc.gov

*Attorneys for Petitioner City of New York*

FOR THE CITY AND COUNTY OF SAN FRANCISCO

DENNIS J. HERRERA
City Attorney

/s/ Robb Kapla
ROBB KAPLA
Deputy City Attorney
Office of the City Attorney
City Hall, Room 234
1 Dr. Carlton B. Goodlett Place
San Francisco, CA 94102
Telephone: (415) 554-4647
robb.kapla@sfcityatty.org

*Attorneys for Petitioner City and County of San Francisco*

*For Petitioners in Case No. 19-1241:*


<u>*/s/ Brian Tomasovic*</u>
BAYRON GILCHRIST, General Counsel
BARBARA BAIRD, Chief Deputy Counsel
BRIAN TOMASOVIC
KATHRYN ROBERTS
South Coast Air Quality Mgmt. District
21865 Copley Dr.
Diamond Bar, CA 91765
Telephone: (909) 396-3400
Fax: (909) 396-2961

*Counsel for South Coast Air Quality Management District*

<u>*/s/ Brian C. Bunger*</u>
BRIAN BUNGER, District Counsel
RANDI WALLACH
Bay Area Air Quality Mgmt. District
375 Beale Street, Suite 600
San Francisco, CA 94105
Telephone: (415) 749-4920
Fax: (415) 749-5103

*Counsel for Bay Area Air Quality Management District*

<u>*/s/ Kathrine Pittard*</u>
KATHRINE PITTARD, District Counsel
Sacramento Metropolitan Air Quality Mgmt. District
777 12th Street
Sacramento, CA 95814
Telephone: (916) 874-4807

*Counsel for Sacramento Metropolitan Air Quality Management District*

*Additional Counsel in Cases No. 19-1230, 19-1243, 20-1178:*

MAYA GOLDEN-KRASNER
KATHERINE HOFF
Center For Biological Diversity
660 South Figueroa Street, Suite 1000
Los Angeles, CA 90017
(213) 785-5402
mgoldenkrasner@biologicaldiversity.org

*Counsel for Center For Biological Diversity*

ARIEL SOLASKI
JON A. MUELLER
Chesapeake Bay Foundation, Inc.
6 Herndon Avenue
Annapolis, MD 21403
(443) 482-2171
asolaski@cbf.org

*Counsel for Chesapeake Bay Foundation, Inc.*

SHANA LAZEROW
Communities For A Better Environment
6325 Pacific Boulevard, Suite 300
Huntington Park, CA 90255
(323) 826-9771
slazerow@cbecal.org

*Counsel for Communities For A Better Environment*

EMILY K. GREEN
Conservation Law Foundation
53 Exchange Street, Suite 200
Portland, ME 04101
(207) 210-6439
egreen@clf.org

*Counsel for Conservation Law Foundation*

MICHAEL LANDIS
The Center For Public Interest Research
1543 Wazee Street, Suite 400
Denver, CO 80202
(303) 573-5995 ext. 389
mlandis@publicinterestnetwork.org

*Counsel for Environment America*

ROBERT MICHAELS
ANN JAWORSKI
Environmental Law & Policy Center
35 East Wacker Drive, Suite 1600
Chicago, IL 60601
(312) 795-3713
rmichaels@elpc.org

*Counsel for Environmental Law & Policy Center*

IAN FEIN
Natural Resources Defense Council
111 Sutter Street, 21st Floor
San Francisco, CA 94104
(415) 875-6100
ifein@nrdc.org

DAVID D. DONIGER
Natural Resources Defense Council
1152 15th Street NW, Suite 300
Washington, DC 20005
(202) 289-6868
ddoniger@nrdc.org

*Counsel for Natural Resources Defense Council, Inc.*

SCOTT L. NELSON
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009
(202) 588-1000
snelson@citizen.org

*Counsel for Public Citizen, Inc.*

JOANNE SPALDING
ANDREA ISSOD
Sierra Club
2101 Webster Street, Suite 1300
Oakland, CA 94612
(415) 977-5725
joanne.spalding@sierraclub.org

PAUL CORT
REGINA HSU
Earthjustice
50 California Street, Suite 500
San Francisco, CA 94111
(415) 217-2077
pcort@earthjustice.org

VERA PARDEE
726 Euclid Avenue
Berkeley, CA 94708
(858) 717-1448
pardeelaw@gmail.com

*Counsel for Sierra Club*

TRAVIS ANNATOYN
Democracy Forward Foundation
1333 H Street NW
Washington, DC 20005
(202) 601-2483
tannatoyn@democracyforward.org

*Counsel for Union Of Concerned Scientists*

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing brief complies with the type-volume limitations of the applicable rules and this Court's briefing format order dated May 20, 2020 (ECF No. 1843712). According to Microsoft Word, the portions of this document not excluded by Federal Rule of Appellate Procedure 32(f) and Circuit Rule 32(e)(1) contain 22,909 words. When added to the words of the other petitioners' brief, this does not exceed the 26,000 words the Court allocated to all petitioners. I further certify that this brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced, 14-point typeface (Garamond).

*/s/ M. Elaine Meckenstock*
M. ELAINE MECKENSTOCK
Deputy Attorney General
1515 Clay Street, 20th Floor
Oakland, CA 94612
Telephone: (510) 879-0299
Fax: (510) 622-2270
Elaine.Meckenstock@doj.ca.gov

**CERTIFICATE OF SERVICE**

I hereby certify that I served the PROOF BRIEF OF STATE AND LOCAL GOVERNMENT PETITIONERS AND PUBLIC INTEREST PETITIONERS and accompanying ADDENDUM by email on all parties in these consolidated cases (at the email addresses listed below) on **Friday, June 26, 2020,** pursuant to the court-ordered schedule. I did so because this Court's CM/ECF system was off-line for maintenance starting from 6:00 Pacific/9:00 p.m. Eastern Time on that date. In accordance with the Court's email notice of June 22, 2020, at 8:19 p.m. Eastern Time, I will file these documents via the CM/ECF system on the next business day after that system becomes available again, which I anticipate will be **Monday, June 29, 2020**. All parties are represented by counsel that are registered CM/ECF users and will be served, again, by the CM/ECF system on that date.

*/s/ M. Elaine Meckenstock*
M. ELAINE MECKENSTOCK
Deputy Attorney General
1515 Clay Street, 20th Floor
Oakland, CA 94612
Telephone: (510) 879-0299
Fax: (510) 622-2270
Elaine.Meckenstock@doj.ca.gov

Email service sent to:

Chloe Kolman (Chloe.Kolman@usdoj.gov)
Daniel Dertke (Daniel.Dertke@usdoj.gov)
*Counsel for Respondents*

Raymond B. Ludwiszewski(RLudwiszewski@gibsondunn.com)
Rachel Levick Corley (RCorley@gibsondunn.com)
*Counsel for Respondent-Intervenor Coalition for Sustainable Automotive Regulation*

Eric Dean McArthur (emcarthur@sidley.com)
*Counsel for Respondent-Intervenor American Fuel & Petrochemical Manufacturers*

Benjamin Flowers (benjamin.flowers@ohioattorneygeneral.gov)
Michael Hendershot (Michael.Hendershot@ohioattorneygeneral.gov)
*Counsel for Respondent-Intervenor States*

Stacey Van Belleghem (Stacey.VanBelleghem@lw.com)
*Counsel for Petitioner National Coalition for Advanced Transportation*

Kevin Poloncarz (KPoloncarz@cov.com)
*Counsel for Petitioners Calpine Corporation, Consolidated Edison, Inc., National Grid USA, New York Power Authority, and Power Companies Climate Coalition*

Jeff Dennis (jdennis@aee.net)
*Counsel for Petitioner Advanced Energy Economy*